IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　)
　　　　　　　　vs.　　　　　 )　No. 12-5018-01-CR-DW
　　　　　　　　　　　　　　　)
SCOTT BRADLEY OLSEN,　　　　 )　April 22, 2013
　　　　　　　　　　　　　　　)
　　　　　　　　Defendant　　 )　Springfield, Missouri


CRIMINAL JURY TRIAL
BEFORE THE HONORABLE DEAN WHIPPLE
UNITED STATES DISTRICT JUDGE


VOLUME 1

APPEARANCES:
FOR THE PLAINTIFF:　　　　　　MR. STEVEN M. MOHLHENRICH
　　　　　　　　　　　　　　　 U.S. ATTORNEY'S OFFICE
　　　　　　　　　　　　　　　 901 St. Louis Street, Ste. 500
　　　　　　　　　　　　　　　 Springfield, MO  65806


FOR THE DEFENDANT:　　　　　　MR. BRIAN D. RISLEY
　　　　　　　　　　　　　　　 LAW OFFICE OF BRIAN RISLEY
　　　　　　　　　　　　　　　 1200-C East Woodhurst
　　　　　　　　　　　　　　　 Springfield, MO  65804


COURT REPORTER:　　　　　　　 MS. JEANNINE RANKIN,CSR,CCR,RPR
　　　　　　　　　　　　　　　 U.S. COURT REPORTER
　　　　　　　　　　　　　　　 222 N. Hammons Parkway
　　　　　　　　　　　　　　　 Springfield, MO  65806


Proceedings reported by stenography; transcript produced by computer.

```
 1                    I N D E X

 2                                         Page No.

 3  APRIL 22, 2013
```

```
 4  PRETRIAL RECORD  .  .  .  .  .  .  .  .  .      5

 5  INSTRUCTION NOS. 1-7 READ  .  .  .  .  .  .  .      7

 6  OPENING STATEMENTS BY MR. MOHLHENRICH  .  .  .  .      7

 7  OPENING STATEMENTS BY MR. RISLEY   .  .  .  .  .  .     13
```

```
 8                 GOVERNMENT'S EVIDENCE

 9  WITNESSES:
```

```
10        CHARLES PYLE
          Direct Examination by Mr. Mohlhenrich   .     16
11
          CONNIE MALONE
12        Direct Examination by Mr. Mohlhenrich   .     23
          Cross-Examination by Mr. Risley  .  .  .     63
13
          MARK PARR
14        Direct Examination by Mr. Mohlhenrich   .     69
          Cross-Examination by Mr. Risley  .  .  .     73
15
          MATTHEW NIEZGODA
16        Direct Examination by Mr. Mohlhenrich   .     75
          Cross-Examination by Mr. Risley  .  .  .     81
17        Redirect Examination by Mr. Mohlhenrich .     84
          Recross-Examination by Mr. Risley .  .  .     88
18
          MYRTLE PYLE
19        Direct Examination by Mr. Mohlhenrich   .     89

20  GOVERNMENT RESTS  .  .  .  .  .  .  .  .  .  .     92

21  DEFENSE MOTION  .  .  .  .  .  .  .  .  .  .  .     92
```

```
22                 DEFENSE'S EVIDENCE
    WITNESSES:
23
```

```
          SCOTT B. OLSEN
24        Direct Examination by Mr. Risley  .  .  .    101
          Cross-Examination by Mr. Mohlhenrich .  .    109
25        Redirect Examination by Mr. Risley  .  .    119
```

```
 1                        I N D E X

 2                                             Page No.

 3   DEFENSE RESTS    .  .  .  .  .  .  .  .  .  .  .  .    120

 4   DEFENSE MOTION    .  .  .  .  .  .  .  .  .  .  .  .    121

 5   APRIL 23, 2013

 6   INSTRUCTION CONFERENCE    .  .  .  .  .  .  .  .  .    123

 7   INSTRUCTION NOS. 8-16, VERDICT FORMS READ   .  .  .    125

 8   CLOSING ARGUMENTS BY MR. MOHLHENRICH  .  .  .  .  .    125

 9   CLOSING ARGUMENTS BY MR. RISLEY .  .  .  .  .  .  .    137

10   REBUTTAL CLOSING ARGUMENTS BY MR. MOHLHENRICH  .  .    144

11   REPORTER'S CERTIFICATE    .  .  .  .  .  .  .  .  .    148

12                    INDEX OF EXHIBITS

13   GOVERNMENT'S EXHIBITS              OFFERED    ADMITTED
```

| GOVERNMENT'S EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| No. 1   Letter 5/09/11 | 25 | 25 |
| No. 2   Letter 5/09/11 | 25 | 25 |
| No. 3   Executive Order | 25 | 25 |
| No. 4   Disaster Declaration | 26 | 26 |
| No. 5   Disaster Amendment | 26 | 26 |
| No. 6   Call Center Scripts | 28 | 28 |
| No. 7   Title 44, 206.111 | 61 | 61 |
| No. 8   Title 44, 206.113 | 61 | 61 |
| No. 9   Help After a Disaster | 30 | 30 |
| No. 10   FEMA Inspection Guidelines | 32 | 32 |
| No. 11   FEMA Olsen file | 33 | 34 |
| No. 14   Photographs | 20 | 20 |

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 3 of 122

```
 1                       INDEX OF EXHIBITS

 2   GOVERNMENT'S EXHIBIT                    OFFERED      ADMITTED

 3   No. 16  2011 Fair Market Rent            58            58

 4   No. 17  Personal Property Rates          58            58

 5   No. 18  General Warranty Deed            17            17

 6   No. 20  Application                      36            36

 7   No. 21  Contacts Report (pgs 1-2)        53            53

 8   No. 24  Submission                       39            39

 9   No. 25  FEMA Denial Letter               43            43

10   No. 26  Declaration and Release          44            44

11   No. 27  Submission                       45            45

12   No. 28  Submission                       49            49

13                     *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1              USA v SCOTT BRADLEY OLSEN

2           CASE NO. 12-5018-01-CR-SW-DW

3              CRIMINAL JURY TRIAL

4                 APRIL 22, 2013

5              *   *   *   *   *   *

6         THE COURT:  Call Case No. 12-05018, United States of

7    America v. Scott Bradley Olsen.  This is pretrial conference.

8    Anything we need to do before we start picking our jury?

9              Mr. Mohlhenrich, you represent the government?

10             MR. MOHLHENRICH:  Yes, sir.

11             THE COURT:  You're going to have Mr. Niezgoda.

12   Anyone else going to be joining you at the table?

13             MR. MOHLHENRICH:  No, Your Honor.

14             THE COURT:  Okay.

15             And, Mr. Risley, you represent the defendant?

16             MR. RISLEY:  Yes, Your Honor.

17             THE COURT:  And the lady's name?

18             MS. WASMUNDT:  Tiffany Wasmundt.

19             THE COURT:  Thank you.  And you are the paralegal?

20             MR. RISLEY:  Paralegal, yes.

21             THE COURT:  All right.

22             Now, of course, I'm going to ask the bulk of the

23   voir dire.  We're going to try to see if we can qualify enough

24   to have a 12-person jury plus one alternate if we have enough

25   jurors.  And when I finish I'll give each counsel an
```

5

1   opportunity to ask follow-up questions if you want to expand

2   on an answer or response that some juror gave.

3          Now, Mr. Risley, I had a question.  I'm not

4   intending to ask this unless you tell me.  "Question 11, Does

5   any member of the jury panel have strong feelings about the

6   war on guns?"  Is guns going to come up?

7          MR. RISLEY:  No, that was a mistake.  I withdraw

8   that one.  I borrowed this from another one.

9          THE COURT:  That's fine.  I couldn't understand why

10  I wanted to ask that.

11         MR. RISLEY:  No.

12         THE COURT:  But I thought I better ask.

13         All right.  Anything further?

14         MR. MOHLHENRICH:  Well, Judge, I wanted to comment

15  to the Court that both counsel expect that this trial could be

16  finished today if we push forward.  It's not -- I don't think

17  the proof is going to be very extensive on either side.

18         THE COURT:  Okay.  That's good to hear.  Of course,

19  it'll depend how knotty voir dire gets.

20         Right now what do we have, Karen?

21         COURTROOM DEPUTY:  Last I heard was 36.

22         THE COURT:  Of course, we had hoped for a few more.

23  Hope to end up with 28 qualified to get our panel, so if we

24  want an alternate, we got to qualify 31.  So we'll see how we

25  come.

6

| | |
|---|---|
| 1 | Anything on behalf of the defense? |
| 2 | MR. RISLEY:  No, Your Honor. |
| 3 | THE COURT:  Okay.  Then I'll be in as soon as we get |
| 4 | ready to sit the panel. |
| 5 | (Court stands in recess.) |
| 6 | (Voir dire conducted.) |
| 7 | THE COURT:  Members of the jury panel that are |
| 8 | staying with us, we're going to get started.  We're ready to |
| 9 | go.  So if you all will stand, raise your right hand to be |
| 10 | sworn in as the trial jury, I'll read the initial instructions |
| 11 | you're going to need. |
| 12 | (Jury duly sworn by courtroom deputy.) |
| 13 | THE COURT:  Thank you.  You may be seated. |
| 14 | I'm going to now read your initial instructions. |
| 15 | (Court reads Instruction Nos. 1-7 to jury and forms |
| 16 | of verdict.) |
| 17 | THE COURT:  Thank you. |
| 18 | Government ready to make its opening statement? |
| 19 | MR. MOHLHENRICH:  Yes, Your Honor.  May it please |
| 20 | the Court. |
| 21 | Good morning.  Once again, thanks for serving. |
| 22 | During the spring of 2011 there were a number of |
| 23 | natural disasters that struck the state of Missouri.  Starting |
| 24 | on about April 19th of that year, severe storms, tornadoes and |
| 25 | flooding caused significant damage up north and that prompted |

7

1 the President of the United States to declare a natural

2 disaster under the Robert T. Stafford Disaster Relief &

3 Emergency Assistance Act. Then on May 22nd, 2011, as everyone

4 knows, an EF5 tornado struck the city of Joplin causing

5 tremendous damage. On May 23rd, 2011, that presidential

6 disaster declaration was expanded to include Jasper and Newton

7 Counties.

8    Now, what this presidential declaration did is it

9 enabled the federal government and primarily the Federal

10 Emergency Management Agency, or FEMA, to provide certain kinds

11 of assistance to individuals affected by this disaster.

12 You'll hear about this in detail from a FEMA representative.

13 Her name is Ms. Connie Malone. She'll talk about the purpose

14 of the FEMA assistance, which is to provide immediate

15 assistance to people who were displaced and harmed by the

16 natural disaster. Various forms of assistance that are

17 authorized include rental assistance, replacement of essential

18 personal property and for homeowners' repairs if a primary

19 residence is damaged. It's not a substitute for insurance.

20    Finally, Ms. Malone will tell you about FEMA's

21 procedures for verifying the eligibility and damages. You'll

22 see why those procedures are necessary because although most

23 of the people who file claims for damage to their property are

24 honest, some are not.

25    One of the homes destroyed by the tornado was at

2305 Virginia Avenue in Joplin.  That was a white,
single-family home.  It was owned by Charles and Myrtle Pyle
since 1977.  Myrtle goes by the name of Kay.  There were four
people who lived at 2305 Virginia Avenue.  Those people were
Charles and Myrtle Pyle, Harry McLaughlin, who was a nephew,
and Clara Rodriguez who was Myrtle Pyle's sister.  The Pyles
were fully insured and they weren't eligible for FEMA
assistance, so although they were displaced by the storm and
the house was destroyed, they were compensated, so they didn't
receive any FEMA assistance.  Harry McLaughlin was just living
there and he did receive some assistance with personal
property that had been damaged and rental assistance in
finding a new place.

Then there was one other person who filed a claim
for damage to his supposed property at 2305 Virginia Avenue
and that was the defendant, Scott Bradley Olsen.  On May 26th
of 2011, Mr. Olsen submitted an online application.  It's a
FEMA form which listed that address as his primary -- as
his -- not a primary residence, a secondary home, and he
explained later on to FEMA that that was where he stored some
business property.  On May 10th of 2011, in fact, he
supplemented his claim with a letter that he was in the
process of moving into the house.  He wrote in the letter that
he lost video production equipment, furniture and personal
property.  He wrote in the letter that the person he was

1    sharing the house with had not been seen since the storm and
2    the utilities were in the other person's name.  On the basis
3    of that representation, which was a little bit different than
4    what was in his first online application, FEMA ordered an
5    inspection because he said he was moving in and that was his
6    primary residence.

7            Olsen met the inspector, it was Mr. Mark Parr, on
8    June 21st of 2011 at the house for an inspection.  After that
9    inspection took place, Mr. Parr entered a comment that the
10   applicant, Mr. Olsen, stated he had no damage to his primary
11   residence, and primary residence equals mailing address, which
12   for Mr. Olsen was a house on Wall Street that wasn't affected
13   by the tornado.  On the basis of that, FEMA denied his claim.

14           However, Mr. Olsen persisted.  On July 12th of 2011,
15   he submitted a statement, a letter, in fact, and a list of
16   property and a rental agreement purportedly signed by an
17   individual named Dean Richey.  Now, the letter that he wrote
18   states, "I entered into a lease on 5/20/11 moving my personal
19   property in on the 21st of May.  The property manager, Dean
20   Richey, signed the document and gave me the keys."  And
21   accompanying this letter was a, you know, lease which had the
22   signature, you know, something -- looks like Dean Richey on
23   it.

24           Now, he further supplemented his claim on July 20th
25   of 2011.  He furnished a letter from Dean Richey and a cover

email from Dean Richey to -- purportedly from Dean Richey to
Mr. Olsen. Now, the letter was word processed. It didn't
have an actual signature on it. It was word processed in kind
of a script font. It read in part, "On the 20th of May last,
I signed the lease agreement with Mr. Scott B. Olsen for the
amount of $375 per month with a negotiated deposit amount of
$300. (This is a reduced amount based on the cleaning and
painting of two rooms that Mr. Olsen agreed to undertake.)
The monies were received by me on the 20th. The keys were
given to Mr. Olsen. The lease was for one year and the
occupancy prior to the 1st of June was authorized as long as
the utilities were transferred into Mr. Olsen's name no later
than May 31st. I returned to the property on the 21st,
(Saturday), to check on the progress of the painting and
witnessed Mr. Olsen moving his personal property into the
residence. The residence was substantially destroyed on
Sunday the 22nd of May, 2011, by the F5 tornado that struck
Joplin. I hope this clarifies Mr. Olsen's resident status and
the monetary arrangement surrounding the rental." So this is
what Mr. Olsen submitted to FEMA.

          FEMA contacted Mrs. Pyle, who was the owner of the
house, who said that she'd never heard of this Scott Bradley
Olsen or Dean Richey, no one had been authorized to rent out
the property, and on the basis of that, FEMA denied the claim.

          Now, Special Agent Niezgoda became involved because

11

he is the criminal investigator with Homeland Security which is what FEMA falls underneath of. Ultimately the defendant was indicted and arrested and Mr. Niezgoda conducted an interview of the defendant at the Joplin Police Department following his arrest.

Now, the facts that you see, his initial online application, he provided some letters and the letters expound on the story a little bit and then the story changes when Special Agent Niezgoda interviewed the defendant. The claims that the defendant made to Special Agent Niezgoda is that, Oh, my, he was the victim of a large scam, a rental scam, and that his former roommate, Jasen Howard, had introduced him to an unscrupulous individual by the name of Dean Richey who collected this money from him and disappeared. He met Richey outside of a big white house. He arrived at the house in a Ford Econoline van that Jasen Howard claimed that he had borrowed with all of the property, this extensive list of personal property in the van. Richey had advised him that the home would be vacant until Saturday the 21st, so they left the property in the van sitting out on the street in front of the house. The van disappeared and he never saw either Jasen Howard or Dean Richey again. That was the defendant's story following his arrest.

Now, these are the facts that you'll hear and at the conclusion of the case I will come back to you and I'll argue

1    that the evidence establishes beyond a reasonable doubt that

2    the defendant, Scott Bradley Olsen, committed the crimes of

3    disaster fraud and making false statements as he's charged.

4            Thank you.

5            THE COURT:  Thank you, Mr. Mohlhenrich.

6            Does the defense wish to make an opening statement

7    or reserve it?

8            MR. RISLEY:  We'll make our opening statement, Your

9    Honor.

10           THE COURT:  All right.  Thank you.  You may proceed.

11           MR. RISLEY:  Ladies and gentlemen of the jury, thank

12   you for your time this morning and for your time today.

13           You've heard the government talk about the evidence

14   that they anticipate you hearing in the case today and I'll go

15   ahead and tell you that we agree with some of the evidence

16   that will be presented will be just as the government set

17   forth.  There was an application that my client filled out,

18   there were some follow-up letters, and there were some

19   communications with members of FEMA as well as with the

20   Homeland Security officer, Mr. Niezgoda, with Officer

21   Niezgoda.

22           The sticking point in all of this and the reason

23   we're here today is that the government has charged Mr. Olsen

24   with making a material false or fraudulent statement or

25   representation specifically stating that his primary residence

13

was 2305 Virginia Avenue.  That's in both counts, essentially

the same line.  When you get to the end of this case, you've

going to get some instructions and there's going to be two of

them because there's two counts charged.  In the first

instruction on both counts you're essentially going to see

that language -- actually, it's materially false or fraudulent

in one and then knowing and intentionally making a statement

claiming his primary residence was 2305 Virginia Avenue.

The issue is the facts that I believe you're going

to hear are going to list three occasions wherein my client

informed FEMA or a representative that 2305 Virginia was not

his primary residence.  There's an application and in

Paragraph 8 it says 2305 Virginia, Paragraph 9 says his

alternate address of Wall Street which the government just

said.  Paragraph 12 says, "Is No. 8 your primary residence?"

It says, "No," says, "secondary."  So he tried to let them

know that.  A follow-up conversation which he referenced on

June 21st with Mr. Parr said, "No, that's not my primary

residence but I lost some property."  And then in another

conversation I believe you'll hear that.

So as the Court instructed you just a minute ago,

Mr. Olsen here is on trial for crimes charged, not anything

else.  And after you hear the evidence of all the government

witnesses of this case -- I think you're going to see the

application, you're going to hear the occasion where the

14

defendant tried to state or tell FEMA that this was not his primary residence, you're not going to see any documentation or letter from defendant where he states, "2305 is my primary residence." At the end of hearing all the evidence and following the rules and instructions of the Court, we believe the only finding you can reach on these two counts is not guilty for Mr. Olsen.

Thank you.

THE COURT: Thank you.

Let's have a quick sidebar, please.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

THE COURT: I propose we recess for lunch, start our evidence right after lunch, try to get lunch in an hour. Any problem with that?

MR. MOHLHENRICH: No, Your Honor.

MR. RISLEY: No, Your Honor.

THE COURT: All right. Thank you.

(PROCEEDINGS RETURNED TO OPEN COURT:)

THE COURT: The better thing to do is we'll take our noon recess and then we'll start the evidence right after lunch. So during this noon recess do not say anything to anyone or allow anyone to say anything to you about the case. Do not form or express any opinions about the issues you will be asked to decide until you've heard all the evidence and had

1    the case submitted to you for deliberation in the jury room.

2              If you'll follow the courtroom deputy, she'll show

3    you your jury room.  Leave the notebooks in your chair and

4    she'll show you.  Let's see if we can -- it's a quarter till

5    12.  Let's see -- let's see if we can't get done by 1:00.

6              Everyone please rise while the jury is recessing for

7    lunch.

8              (Jury exits courtroom at 11:43 a.m.)

9              THE COURT:  All right.  Be in recess.  See you at

10   1:00.

11             (Court stands in recess at 11:43 a.m.)

12             (Jury enters courtroom at 1:00 p.m.)

13             THE COURT:  Call your first witness.

14             MR. MOHLHENRICH:  Yes, Your Honor.  The government

15   calls Charles Pyle.

16   CHARLES PYLE, GOVERNMENT WITNESS, SWORN:

17                        DIRECT EXAMINATION

18   BY MR. MOHLHENRICH:

19   Q    Good afternoon, Mr. Pyle.  Thanks for coming in.

20             Could you please tell the members of the jury where

21   you now live?

22   A    We reside -- our house -- our now house is 841 Empire.

23   We are at the moment staying with our daughter in Neosho.

24   Q    Mr. Pyle, before that where did you live?

25   A    2305 Virginia.

```
 1   Q    In Joplin?

 2   A    Yes.

 3   Q    And how -- did you own the property?

 4   A    Yes.

 5   Q    How long had you lived there?

 6   A    Since February of '77.

 7   Q    I'm showing you what's been marked as Government's

 8   Exhibit No. 18.  Could you please take a look at that exhibit.

 9   Can you tell the jury what it is?

10   A    It's a deed, general warranty deed for the property.

11   Q    That's the deed that you purchased the property with?

12   A    Yes.

13        MR. MOHLHENRICH:  I move to admit Exhibit 18.

14        THE COURT:  What's the number again?

15        MR. MOHLHENRICH:  Eighteen.

16        MR. RISLEY:  No objection, Your Honor.

17        THE COURT:  Government's Exhibit 18 will be

18   admitted.

19        MR. MOHLHENRICH:  Retrieving that from the witness

20   and publishing that up on the ELMO.

21   Q    (By Mr. Mohlhenrich) And who else owned the property

22   with you, Mr. Pyle?

23   A    My wife.

24   Q    And did she also live there since 1977?

25   A    Yes.
```

17

1  Q    Now, when the tornado struck Joplin on May 22nd of 2011,

2  did you and your wife reside there?

3  A    Yes.

4  Q    Who else lived in the property at the time?

5  A    At the time there was my sister-in-law, Jacqueline

6  Rodriguez, and Harry McLaughlin, her son.

7  Q    He was your nephew?

8  A    Yes.

9  Q    Can you describe for the jury what happened that day?

10 A    Well, we had -- there was some shopping I needed to do,

11 there was some groceries and stuff.  I had gone to the grocery

12 store to go shopping.  I was going to pick up some carry-out

13 to bring home.  About the time I got to the carry-out location

14 at 20th and Main, why, the lights flickered, the sirens went

15 off and the lights went out and the storm hit.

16 Q    And what did you do next?

17 A    I pulled out of where I was at on the drive-thru and

18 pulled into a parking lot next to them.  It's a veterinary

19 establishment.  And I waited out the storm there.  I was on

20 the very edge of it.

21 Q    And what happened as soon as the storm had passed?  What

22 happened as soon as the storm passed?

23 A    As soon as the storm had gotten down to where it was just

24 raining, I pulled out of there and I headed down to the house

25 which is south of Main.

```
 1   Q    Did you have any trouble finding your place?

 2   A    Yes, I did.  The minute I crossed 20th Street, which is

 3   one of the streets just there, why, you lose all sense of

 4   direction.  There was no trees, no buildings.  Buildings were

 5   all down.  Lines were down in the road and everything.  Pretty

 6   much count the streets to get where you were going.

 7   Q    What did you find when you got to your address?

 8   A    I pulled in front of the house.  Luckily, it was

 9   completely open.  Pulled in front of the house and the front

10   porch -- front part of the second story had been pulled up and

11   off and laid into the back yard.

12   Q    Who was present in the house at the time?

13   A    My wife and my sister-in-law.

14   Q    Did they make it okay?

15   A    They were in the basement.  Yes, they were fine.

16   Q    I'm showing you what's been marked as Government's

17   Exhibit No. 14.  Can you take a look at that, please?  What is

18   that?

19   A    That's the aftermath of my house.

20   Q    Those two photographs there, do they accurately depict

21   the way your house looked after the tornado?

22   A    Yes, they do.

23            MR. MOHLHENRICH:  Move to admit Government's Exhibit

24   No. 14.

25            THE COURT:  Any objection?
```

```
 1              MR. RISLEY:  I need to look at it real quick.

 2              MR. MOHLHENRICH:  Certainly.

 3              Retrieving the exhibit from the witness.

 4              MR. RISLEY:  No objection, Your Honor.

 5              THE COURT:  Government's Exhibit 14 will be

 6    admitted.

 7              MR. MOHLHENRICH:  Publishing this to the jury on the

 8    ELMO.

 9    Q    (By Mr. Mohlhenrich) So this first photograph here that

10    shows a house, that's your house?

11    A    Yes, sir.

12    Q    And what color was the house before the tornado?

13    A    It was the red of the siding you see there.

14    Q    And it had white trim on the siding and in the front of

15    the porch?

16    A    Yes.

17    Q    And this second photograph, does this accurately depict

18    the way your house looked from the inside?

19    A    Yes, it does.

20    Q    Thank you.

21              Now, after the tornado did you or you wife receive

22    any disaster funds as a result of the damage?

23    A    No.  We had insurance.

24    Q    You had insurance to cover that?

25    A    Yes.
```

20

```
 1   Q    How about Harry McLaughlin?

 2   A    Yes.  No, as far as I know he -- he might have gotten

 3   something through them but I don't think so.

 4   Q    Okay.  And you've, of course, heard the story that

 5   someone else claimed to have been residing at your home at the

 6   time so I'm going to ask you a couple of names.  Have you ever

 7   heard of a Jasen Howard?

 8   A    No, sir.

 9   Q    And has anybody by that name ever resided at 2305

10   Virginia while you were living there?

11   A    No, sir.

12   Q    Has anybody by that name ever had or stored any property

13   at 2305 Virginia while you were living there?

14   A    No, sir.

15   Q    Have you heard the name Dean Richey?

16   A    No, sir.

17   Q    And you don't know anybody by that name?

18   A    No, sir.

19   Q    Did anybody by the name of Dean Richey ever have yours or

20   your wife's permission to rent your house out or show your

21   house to anybody who wanted to lease it?

22   A    No, sir.

23   Q    How about Scott Bradley Olsen, did you know anybody by

24   that name living in your house?

25   A    No, sir.
```

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 21 of 122

```
 1   Q    Did anybody by that name ever attempt to move into your
 2   house?
 3   A    No, sir.
 4   Q    I'm going to ask you to look at the gentleman sitting
 5   there next to Mr. Risley in the darker suit with the open
 6   collar shirt.  Have you ever seen that gentleman before?
 7   A    No, sir.
 8   Q    Finally, thinking back to the two days before the
 9   tornado, did you ever notice a large, white Ford Econoline van
10   parked on the street in front of your residence?
11   A    Not that I remember, no, sir.
12   Q    Did you ever notice any people standing out in front of
13   your residence pointing at it and perhaps signing some papers?
14   A    No, sir.
15           MR. MOHLHENRICH:  Nothing further for this witness.
16           THE COURT:  Thank you.
17           Cross-examination?
18           MR. RISLEY:  I have no questions, Your Honor.  Thank
19   you.
20           THE COURT:  May this witness be excused?
21           MR. MOHLHENRICH:  Yes, sir.
22           THE COURT:  Defense?
23           MR. RISLEY:  Yes, Your Honor.
24           THE COURT:  All right.  Mr. Pyle, thank you for your
25   attendance.  You're free to go.
```

```
 1              Call your next witness.
 2              MR. MOHLHENRICH:  The government next calls
 3    Ms. Connie Malone to the stand.
 4    CONNIE MALONE, GOVERNMENT WITNESS, SWORN:
 5                        DIRECT EXAMINATION
 6    BY MR. MOHLHENRICH:
 7    Q    Good afternoon, Ms. Malone.  Would you please tell the
 8    jury who you're employed by?
 9    A    Department of Homeland Security, FEMA, Federal Emergency
10    Management Agency.
11    Q    How long have you been with FEMA?
12    A    Little over 17 years, since 1996.
13    Q    What is your position with FEMA?
14    A    I am a program specialist liaison.
15    Q    What does that mean?  What do you do?
16    A    Mostly I deploy to field disaster areas and assist with
17    policy and procedure between headquarters and the field.
18    Q    In the course of your career with FEMA, how many
19    disasters have you deployed to?
20    A    Since 2009 the best I can tell you is right around 20.
21    Q    And how many disasters did you assist in where you didn't
22    deploy?
23    A    Oh.  Well, I'll give you a number since our new system
24    came into place 2000.  It was about 450.
25    Q    And when's the last disaster that you deployed to?
```

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 23 of 122

```
 1   A     I just returned March 29th from Mississippi.

 2   Q     Okay.  And we're in Missouri right now.

 3   A     Yeah.

 4   Q     Okay.  Could you please tell the jury what federal law

 5   authorizes the government to provide disaster assistance to

 6   people who have been harmed by natural disaster?

 7   A     Robert T. Stafford Act.

 8   Q     What is the prerequisite for the government being able to

 9   provide that assistance?  Do you need some sort of

10   declaration?

11   A     Yes, federally declared declaration.

12   Q     I'm showing you what have been marked as Government's

13   Exhibits 1 and 2.  Could you please take a look at those and

14   tell me what they are?

15   A     This is the letter to our director, Mr. Fugate,

16   authorizing him or letting him know that a declaration has

17   been submitted for Missouri.

18   Q     And Exhibit No. 2?

19   A     This would be a letter from the President sending it to

20   the governor of Missouri.

21   Q     And both of those letters bear the President's signature

22   and come from FEMA's records?

23   A     Yes, sir.

24         MR. MOHLHENRICH:  Move to admit Government's

25   Exhibits No. 1 and 2.
```

24

1          MR. RISLEY:  No objection, Your Honor.

 2          THE COURT:  Government's Exhibits 1 and 2 will be

 3   admitted.

 4          MR. MOHLHENRICH:  Okay.  Publishing Government's

 5   Exhibit No. 1 up on the ELMO.

 6   Q    (By Mr. Mohlhenrich) Now that a disaster has been

 7   declared, what sorts of aid can be provided?

 8   A    Temporary housing, which would be rental assistance,

 9   repair, replacement, direct housing, otherwise known as

10   permanent housing.

11   Q    Is that all implemented and administered by FEMA?

12   A    Yes, sir.

13   Q    Okay.  I'm showing you Government's Exhibit No. 3.  Could

14   you please tell the jury what that is?

15   A    This is Executive Order 12148 where it's giving

16   authorization for the director to take over all functions for

17   the declaration.

18   Q    Thank you.

19          MR. MOHLHENRICH:  Move to admit Government's Exhibit

20   No. 3.

21          MR. RISLEY:  No objection, Your Honor.

22          THE COURT:  Thank you.  Government's Exhibit No. 3

23   will be admitted.

24   Q    (By Mr. Mohlhenrich) I'm showing you Government's

25   Exhibit No. 4.  Could you tell the jury what that is?

                                    25

1    A    This is the first notification that comes out to the lay

2    staff, which is us in the field or those deploying to the

3    field, letting us know that the declaration has been declared.

4    Q    What's the date of that?

5    A    May 9, 2011.

6    Q    Okay.

7              MR. MOHLHENRICH:  And move to admit Government's

8    Exhibit No. 4.

9              MR. RISLEY:  No objection, Your Honor.

10             THE COURT:  Thank you.  Government's Exhibit No. 4

11   will be admitted.

12   Q    (By Mr. Mohlhenrich) I'm handing you Government's

13   Exhibit No. 5.  Can you tell the jury what that is?

14   A    This is the amendment to the declaration that was

15   declared on May 9th listing two additional counties, Jasper

16   and --

17   Q    Would that be Jasper and Newton Counties?

18   A    Yes, added to the declaration.

19   Q    And that was May 23rd of 2011, the day after the tornado?

20   A    Yes, sir.

21             MR. MOHLHENRICH:  Move to admit Government's Exhibit

22   No. 5.

23             MR. RISLEY:  No objection, Your Honor.

24             THE COURT:  Thank you.  Government's Exhibit No. 5

25   will be admitted.

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 26 of 122

1  Q    (By Mr. Mohlhenrich) Now, once the disaster declaration

2  was expanded to include Jasper and Newton Counties in the

3  wake of the Joplin tornado, what did FEMA do?

4  A    Well, anybody that registered at the time of the

5  declaration even if they registered undesignated counties, it

6  would have just moved right over to the declaration and

7  immediately started processing.

8  Q    By register, you mean the people can apply for benefits?

9  A    Right.

10 Q    How do they do that?

11 A    You can do it by smartphone now, by the telephone,

12 online, a lot of people have filed online.

13 Q    Can people also come in to locations that FEMA sets up?

14 A    Yeah, in recovery centers they have phone banks set up

15 which you would also be calling back to NPSC, National

16 Processing Service Center, to register, or sometimes they have

17 computers set up and you can do online registration there.

18 Q    When you use the word recovery center, is that also a

19 disaster recovery center or DRC?

20 A    Yes.

21 Q    So when you're using those terms, that's what you're

22 referring to, a place where people can go in person to get

23 assistance?

24 A    Yes.

25 Q    I'm handing you Government's Exhibit No. 6.  Can you

1   please tell the jury what that exhibit is?

2   A    This is just guidelines for people that are registering

3   online.  This is also a user guide for in-house, for us.  This

4   mainly gives you the script of what you're going to see when

5   you register online.

6   Q    So those are the questions that people need to answer in

7   order to apply for benefits?

8   A    Correct.

9   Q    And referring to a question about primary residence --

10        MR. MOHLHENRICH:  I'm sorry.  Move to admit

11  Government's Exhibit No. 6.

12        MR. RISLEY:  No objection, Your Honor.

13        THE COURT:  Government's Exhibit 6 will be admitted.

14  Q    (By Mr. Mohlhenrich) I'll put a duplicate of that up on

15  the ELMO because I know that you read a little bit better

16  with the exhibit in front of you, don't you?

17  A    Yes.

18  Q    Now, referring to page 11, could you please tell the jury

19  what that says about residency requirements?

20  A    Are you talking about on damaged dwelling?

21  Q    Yes.

22  A    "Please provide the following information about the

23  damaged dwelling:  Where are you currently living or staying?

24  Select from:  In your car, your damaged dwelling, family/

25  friend's dwelling, hotel/motel, mass shelter, rental unit,

28

1  other, place of employment."

2  Q    That's not going to show very well up on the ELMO so I'll

3  just let you describe for the jury, what is the significance

4  of the term primary residence?

5  A    Well, we don't address secondary homes.  Primary

6  residence is somewhere where you spend six months out of the

7  year, where you vote.

8  Q    Is that where somebody lives?

9  A    Yes.

10  Q    And what's the reason for that?  What is the reason it's

11  significant?  Can people claim for damage to a secondary

12  residence?

13  A    They can claim it but we won't address it.  We don't

14  address secondary homes.  Our goal is to get people housed in

15  houses that are no longer able to live in their primary

16  residence.

17  Q    FEMA's not meant to be a replacement for everything that

18  a person happens to lose in a disaster?

19  A    That's correct.

20  Q    What sorts of things is the FEMA assistance supposed to

21  help with?

22  A    It's not going to get you back where you were before the

23  disaster.  We just want to make sure you have shelter, a dry

24  place to stay, essential personal property to live.  It's not

25  going to replace all of the things that you had before.

29

1  Q    Okay.  I'm showing you what's been marked as Government's
2  Exhibit No. 9.  Can you please tell the jury what that is?
3  A    This is the booklet Help After Disaster, An Applicant's
4  Guide.  One of these will go out with every registration.  A
5  lot of people are doing online now, they get all their
6  correspondence through the computer, and a copy of this would
7  go.  They can also pick up one at the disaster recovery
8  center.  It's just a step-by-step guide to tell you about what
9  FEMA does, what you're possibly eligible for.  It tells you
10 what to do if you see something wrong on your application.  It
11 tells you how to appeal.  It just has a lot of good
12 information step-by-step to lead you through the process.
13            MR. MOHLHENRICH:  Move to admit Government's Exhibit
14 No. 9.
15            MR. RISLEY:  No objection, Your Honor.
16            THE COURT:  Thank you.  Government's Exhibit 9 will
17 be admitted.
18            MR. MOHLHENRICH:  Publishing the cover of that up on
19 the ELMO so that the jury can see what we're referring to.
20 Q    (By Mr. Mohlhenrich) That's disseminated in a variety
21 of ways like you just testified?
22 A    Correct.
23 Q    Okay.  Now, who is it that initially evaluates whether an
24 individual is eligible for FEMA assistance?
25 A    Well, we have business rules that if you register and

                                30

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 30 of 122

1  Q    Okay.  I'm showing you what's been marked as Government's
2  Exhibit No. 9.  Can you please tell the jury what that is?
3  A    This is the booklet Help After Disaster, An Applicant's
4  Guide.  One of these will go out with every registration.  A
5  lot of people are doing online now, they get all their
6  correspondence through the computer, and a copy of this would
7  go.  They can also pick up one at the disaster recovery
8  center.  It's just a step-by-step guide to tell you about what
9  FEMA does, what you're possibly eligible for.  It tells you
10 what to do if you see something wrong on your application.  It
11 tells you how to appeal.  It just has a lot of good
12 information step-by-step to lead you through the process.
13            MR. MOHLHENRICH:  Move to admit Government's Exhibit
14 No. 9.
15            MR. RISLEY:  No objection, Your Honor.
16            THE COURT:  Thank you.  Government's Exhibit 9 will
17 be admitted.
18            MR. MOHLHENRICH:  Publishing the cover of that up on
19 the ELMO so that the jury can see what we're referring to.
20 Q    (By Mr. Mohlhenrich) That's disseminated in a variety
21 of ways like you just testified?
22 A    Correct.
23 Q    Okay.  Now, who is it that initially evaluates whether an
24 individual is eligible for FEMA assistance?
25 A    Well, we have business rules that if you register and

1  everything meets the business rules, what I mean is identity
2  has passed, that's where your name and social match,
3  occupancy, ownership is not a criteria.  Basically, it's
4  renters, for rental.  So it would be IDV, occupancy, 969 has
5  been signed, and it will go through the system clean.
6  Q    Are there also inspections to determine what property
7  people might have lost?
8  A    Right.
9  Q    Do inspectors have guidelines that they follow?
10 A    Yes.
11 Q    And I'm referring you to Government's Exhibit No. 10.
12 Can you tell the jury what that is?
13 A    This is the inspection guidelines that every inspector
14 has with him.  It's just -- it's kind of like their bible.  It
15 gives them a step-by-step.  If they run into a situation they
16 don't know how to answer it, for instance, an example I could
17 give you, if we tear out a bathroom floor, it just tells him
18 in here also include a toilet reset.  So it's just his bible.
19 It's just their way of doing a correct inspection.
20 Q    So it goes to that level of detail?
21 A    Absolutely.
22 Q    Is the goal to insure that all of these are processed
23 consistently?
24 A    Yes, sir.
25        MR. MOHLHENRICH:  Move to admit Government's Exhibit
                                    31

```
 1   No. 10.

 2              MR. RISLEY:  No objection.

 3              THE COURT:  Government's Exhibit 10 is admitted.

 4   Q    (By Mr. Mohlhenrich) Those are the inspection

 5   guidelines that were actually in place during this disaster,

 6   correct?

 7   A    Yes.

 8   Q    By the way, I don't think I covered it before, was there

 9   a numerical designation for this particular disaster?

10   A    Yes, 1980.

11   Q    That's the number that this disaster is referred to?

12   A    Every disaster has a number.

13   Q    Now, showing you what's been marked as Government's

14   Exhibit No. 11.  Can you please tell the jury what that is?

15   A    This would be the certified copy that was sent from the

16   mailroom NCT to you.

17   Q    Okay.  That would be the certified copy of what?

18   A    Copy of the registration, copy of the comments, copy of

19   the letters that were sent, the contacts, any incoming mail

20   that we received from the applicant.

21   Q    Generally are we talking about a FEMA file for one Scott

22   Bradley Olsen?

23   A    Yes.

24   Q    Those are official documents of FEMA that have been

25   certified and kept in the normal course of business?
```

A    Yes, sir.

MR. MOHLHENRICH:  Move to admit Government's Exhibit No. 11.

MR. RISLEY:  May we approach, Your Honor?

THE COURT:  Yes.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MR. RISLEY:  I don't want to object to the file -- there are parts of the file that contain comments of people that aren't here.  I'm afraid some of those comments will contain hearsay.  I understand it's the official file on the record, but I think focusing on those comments may be getting into some hearsay.  For that basis I would object to those statements that contain comments of people he may have talked to.

MR. MOHLHENRICH:  In response the government would say that the government will not publish the entire file to the jury.  We have selected certain sections of it that we'll present individually as exhibits to be published.

THE COURT:  Okay.  But we must keep record of it, make sure that's all we're going to send to the jury.  If they ask for this during deliberations, defense is right, we can't send them the entire file.  So I'm going to admit it with the qualification that the parts that are shown to the jurors shall be sent to the jury for deliberation.

33

```
 1            MR. MOHLHENRICH:  Understood, Your Honor.

 2            THE COURT:  All right.

 3            MR. RISLEY:  Thank you, Your Honor.

 4   (PROCEEDINGS RETURNED TO OPEN COURT:)

 5            THE COURT:  What was the number of that exhibit?

 6            MR. MOHLHENRICH:  Eleven, Your Honor.

 7            THE COURT:  Government's Exhibit 11 will be admitted

 8   qualifiedly.

 9   Q    (By Mr. Mohlhenrich) Now I'm going to show you

10   Government's Exhibits No. 20 through 28.  These are

11   individual parts of Government's Exhibit No. 11 that you've

12   looked at before?

13   A    Okay.

14   Q    Are those -- there was a question pending.  Each of those

15   exhibits, No. 20 through 28, those all came from Government's

16   Exhibit No. 11?  They're smaller parts of that file that --

17   A    Yes, sir.

18   Q    -- will perhaps be helpful to the jury?

19   A    Yes.

20   Q    Focusing you first on Government's Exhibit No. 20, what

21   is that document?

22   A    This is a copy of the registration.  We send a copy to

23   the applicant after they register, whichever way they

24   register, by phone, smartphone, online.

25   Q    So that is an actual print-out of an application that was
```

```
 1   made.  Who was the applicant?

 2   A    Scott Olsen.

 3   Q    And is it -- is that document a record of his answers to

 4   the questions in Exhibit 6 which was the registration script?

 5   A    Yes, sir.

 6   Q    And on what date was the disaster assistance application

 7   filed?

 8   A    5/26.

 9   Q    That would be May 26th?

10   A    May 26th.

11   Q    That's fine.  I think the jury understands but just to

12   clarify, May 26th.

13              THE COURT:  What year?

14              THE WITNESS:  2011.

15              MR. MOHLHENRICH:  Thank you, Judge.

16   Q    (By Mr. Mohlhenrich) What address did Mr. Olsen file

17   for?

18   A    2305 Virginia Avenue, Joplin, Missouri.

19   Q    How did he answer the question of if this property was

20   his primary residence at the time of the disaster?

21   A    He listed it as a secondary home.

22   Q    Based on that answer, would an inspection have been

23   ordered of 2305 Virginia Avenue in conjunction with

24   Mr. Olsen's application?

25   A    No.
```

```
 1            MR. MOHLHENRICH:  Move to admit Exhibit 20.

 2            MR. RISLEY:  No objection, Your Honor.

 3            THE COURT:  Exhibit 20 will be admitted.

 4   Q    (By Mr. Mohlhenrich) Now, what is Exhibit No. 21?

 5   A    This is contacts from the events log.  Each time

 6   something happens in the process, it goes into what we call

 7   the events log.  It's kind of like the index.  Any comments,

 8   any time the applicant contacts us, any time we do any work on

 9   his case, these go into the events log.

10   Q    Okay.  And Exhibit No. 22, what is that document?

11   A    It's the same thing, just a continuation.  This is the

12   comments report.

13   Q    Okay.  And what's the difference between the contacts and

14   the comments?

15   A    Contacts are when we actually attempt to contact someone

16   or we are talking with them whether we're sitting across from

17   them or they're on the phone with us.  A comment is something

18   that we do in the way of processing.

19   Q    Okay.  And do those reports all contain statements that

20   other people have made to FEMA?

21   A    Correct.

22   Q    And some statements that Mr. Olsen has made to FEMA?

23   A    Correct.

24   Q    It's all mixed in there in different line entries?

25   A    Yeah.  Anything that he said would be a contact, anything
```

1   that we did on our own would be a comment.

2   Q    So I'm going to ask you to address specific parts of

3   those two exhibits as we're referring to other exhibits that

4   we go through, so if you could keep those handy with you.

5            Now, looking at -- there was a June 10, 2011, entry

6   in the contacts report.  Can you please advise the jury what

7   that entry indicates?

8            MR. RISLEY:  Judge, objection.  Can we approach?

9   (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

10  WERE HAD:)

11           MR. RISLEY:  For the record I'll object to this

12  testimony as hearsay.  I believe it comes from a contact that

13  this woman didn't say.  I understand these are business

14  records, but she's essentially going to testify as to what

15  somebody else heard him say and then report.

16           MR. MOHLHENRICH:  Government's response is it's the

17  statement of a defendant so that's the exception to the

18  hearsay rule.

19           THE COURT:  This is the statement the defendant

20  given to someone -- or to this lady?  Who's it given to?

21           MR. MOHLHENRICH:  It was given to a FEMA

22  representative and entered it into the FEMA system's records.

23           THE COURT:  Are you going to establish who that was

24  given to?

25           MR. MOHLHENRICH:  Yes.

37

```
 1          THE COURT:  Okay.  With that indication, objection
 2   overruled.
 3          MR. MOHLHENRICH:  Thank you, Judge.
 4   (PROCEEDINGS RETURNED TO OPEN COURT:)
 5   Q    (By Mr. Mohlhenrich) Now, who made that entry into the
 6   contacts report?
 7   A    Mary Farrell who was at one of the disaster recovery
 8   centers.  This is DRC No. 6.
 9   Q    By the way, where is DRC No. 6 located?  Is that
10   somewhere within Joplin?
11   A    Yes.
12   Q    And what does that contact indicate?
13   A    Well, it indicates the applicant came into the recovery
14   center and talked to one of the agents there.  Her comment is,
15   "App stated was in the process of moving into the house when
16   the storm hit.  App said he lost all his video production
17   equipment he used in his business, furniture and other
18   personal property.  App stated no renter's insurance.  App
19   stated person sharing house with has not been seen since the
20   storm  and the utilities were in the other person's name.  App
21   furnished letter to clear up possible duplication of address.
22   Routed to IRS."  This would have had a document with it.
23   Q    By app, are you referring to the claimant on that file,
24   Mr. Scott Bradley Olsen?
25   A    Yes, sir.
```

1   Q    Now, I'm going to show you Exhibit No. 24.  As a matter
2   of fact, you have it in front of you.  Could you please pull
3   out Exhibit No. 24.  Can you tell the jury what that exhibit
4   is?
5   A    This is a letter that was submitted by the applicant at
6   the DRC to be sent to the mailroom to be scanned into the
7   file.  It's a letter of intent to occupy.
8   Q    Okay.  And that's the letter that was provided to FEMA?
9   A    Yes.
10           MR. MOHLHENRICH:  Move to admit Government's Exhibit
11  No. 24.
12           MR. RISLEY:  No objection, Your Honor.
13           THE COURT:  Government's Exhibit 24 will be
14  admitted.
15  Q    (By Mr. Mohlhenrich) If you could open that up and read
16  it to the jury, specifically the third page.  I'm also
17  publishing this up on the ELMO.
18  A    Third page is a letter from Scott Olsen.  "I, Scott
19  Olsen, and Jasen Howard were co-renting the single-family home
20  at the above address.  I was paying the deposit cash, Jasen
21  was to pay the electric and the gas in his name and we would
22  split the rent 375.  Jasen was last seen by the clerk at Steak
23  & Shake on the 20th -- "
24  Q    Could that be Snack Attack?
25  A    Yeah, possibly.  "-- on the 20th walking south just prior

to the tornado.  Under penalty of perjury I declare this
statement is true."

Q    So, "I, Scott Olsen, and Jasen Howard were co-renting the
white, single-family home at the above address."

What would that statement indicate to FEMA personnel
who are processing that application?

MR. RISLEY:  Judge, I object.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS
WERE HAD:)

MR. RISLEY:  Objection.  Calls for speculation for
her to form a mental impression based off what the letter
indicates.  Best evidence is the letter itself.

MR. MOHLHENRICH:  This lady is a FEMA program
specialist.  She processes these documents for a living.  I'm
asking her how she would process -- or how a FEMA personnel
would process documents that have statements like that in it.

THE COURT:  Rephrase the question in that manner.
Objection will be overruled.  What she would do with that
letter, how she would process it.

MR. MOHLHENRICH:  Thank you, Your Honor.

(PROCEEDINGS RETURNED TO OPEN COURT:)

Q    (By Mr. Mohlhenrich) Ms. Malone, based on the statement
in that letter, how would FEMA personnel process the
applicant's claim?

A    Well, normally we would issue an inspection.  We would

40

1  have to do some calling first to verify or have the applicant

2  supply documents proving they intended to occupy a home, for

3  instance, leaving one place and going to another, maybe a

4  termination of a lease.  It would just require a little more

5  work on our part as far as verifying information.

6  Q    And based on that submission by the applicant, Mr. Olsen,

7  was an inspection ordered of 2305 Virginia?

8  A    Yes.

9  Q    And how do you know that?

10 A    From the file.

11 Q    Okay.  Now, during the inspection -- first of all, can

12 you please tell the jury what normally happens when there is

13 an inspection?  Who is the inspector?  What does an inspector

14 do?

15 A    Well, in this case we order the inspection.  The

16 inspector goes out -- or he calls the applicant normally to

17 set up an appointment, unless he happens to be in the area, he

18 might stop by, but typically they call, make an appointment to

19 meet the applicant at the damaged dwelling.

20 Q    What date did the inspection in this particular case take

21 place?

22 A    6/21.

23 Q    And that was June 21st of 2011?

24 A    Yes.

25 Q    And what did the inspector indicate that Mr. Olsen said

41

1  to him?

2  A    The inspector said not primary residence, "app did not

3  reside at the DD," which is damaged dwelling, "at the time of

4  the disaster.  App had temporarily stored self-employment

5  business items equal camera, film, movies at the DDA," damaged

6  dwelling address.  "App stated no damage to primary

7  residence," which equals his mailing address, which he's

8  telling us his primary residence was the address he gave for

9  his mailing address.

10  Q    Okay.  So when an individual indicates that they're

11  storing self-employment business items at a location and that

12  it's not their primary residence, is that something that FEMA

13  would pay money to them for?

14  A    No.  We don't address business items.  That would fall

15  under Small Business Administration.  We are housing.  We

16  handle temporary housing.

17  Q    So did FEMA deny his claim?

18  A    Yes, sir.

19  Q    And referring you to Exhibit No. 25, can you please tell

20  the jury what that document is?

21  A    This is a copy of the outgoing letter of denial to

22  Mr. Olsen.

23          MR. MOHLHENRICH:  Move to admit Government's Exhibit

24  No. 25.

25          MR. RISLEY:  No objection, Your Honor.

42

1          THE COURT:  Government's Exhibit 25 will be

2    admitted.

3          MR. MOHLHENRICH:  Publishing the first page of that

4    to the jury.

5    Q    (By Mr. Mohlhenrich) This is a denial letter informing

6    Mr. Olsen that he was found not eligible for benefits.  What

7    was the reason that FEMA found him not eligible for the

8    benefits?

9    A    Occupancy not verified.

10   Q    Okay.  Now, returning to Exhibit No. 21 which is the

11   contacts report, what happened on July 1st of 2011?

12   A    The applicant went back to DRC 6 and he submitted a 9069,

13   which is declaration of release which is a document stating

14   that you are a U.S. citizen and that the statements that you

15   give are true and correct.

16   Q    Declaration and release and 9069, those terms are used

17   synonymously by FEMA personnel?

18   A    Yes.

19   Q    9069 is actually an outdated reference, isn't it?

20   A    Yes.  It's 009 now but it will always be 9069.

21   Q    If you see or the jury were to see a reference to 9069 in

22   the records, that would be a reference to a declaration and

23   release?

24   A    Correct.

25   Q    And could you take a look at Exhibit No. 26.  Is that a

43

1  declaration and release with Scott Bradley Olsen's signature

2  on it?

3  A    Yes, it is.

4          MR. MOHLHENRICH:  Move to admit Government's

5  Exhibit 26.

6          MR. RISLEY:  No objection, Your Honor.

7          THE COURT:  Thank you.  Government's Exhibit 26 will

8  be admitted.

9          MR. MOHLHENRICH:  I'm publishing that to the jury.

10  Q    (By Mr. Mohlhenrich) So this is the applicant's

11  affirmation that the information that they provided in their

12  application is true and correct?

13  A    Correct.

14  Q    Okay.  What other -- what was the next submission that

15  Mr. Olsen had made?

16  A    The one on 7/9?

17  Q    Yeah, referring you to Exhibit 21, the contacts report,

18  for July 9th of 2011.

19  A    He went back to the DRC.  DRC 6, "Verified critical info.

20  App stated he had no renter's insurance.  App states he moved

21  to the rental apartment on May 21st with all his belongings.

22  App states he lost everything due to the tornado.  App never

23  received FEMA inspection.  App also states that there is

24  nothing left of the damaged dwelling, everything has been

25  removed.  App submits letter stating under penalty that he was

44

1  living in the apartment at the time of the tornado.  App
2  submits proof of lease for damaged dwelling along with
3  itemized loss of personal property items."
4  Q    So that's an indication that Mr. Olsen returned to the
5  disaster recovery center and submitted more documents and gave
6  an explanation?
7  A    Yes.
8  Q    Now, referring you to Exhibit No. 27, what is that?
9  A    App request submitting following occupancy statement,
10 loss of personal property items and proof of renter's lease.
11 Q    Those are documents that were received there at that
12 disaster recovery center?
13 A    Yes, sir.
14       MR. MOHLHENRICH:  Move to admit Government's Exhibit
15 No. 27.
16       MR. RISLEY:  No objection, Your Honor.
17       THE COURT:  Thank you.  Government's Exhibit 27 will
18 be admitted.
19       MR. MOHLHENRICH:  I'm publishing starting on the
20 second page -- the first page is a cover sheet, the second
21 page to the jury.
22 Q    (By Mr. Mohlhenrich) Could you please read that letter
23 to the jury?
24 A    "I, Scott Olsen, this statement accompanies my rental
25 agreement for the home at 2305 Virginia in Joplin, Missouri.

45

I entered into a lease on 5/20/11 moving my personal property

in on the 21st of May. The property manager, Dean Richey,

signed the document and gave me the keys. The address and

contact info for him and the owner were in the house when the

tornado struck. All I have is the rental agreement receipt.

The house at 2305 Virginia has also never been inspected by

FEMA. There is/are no rental insurance on personal property."

Q     Okay. Looking at the next page that was -- attached is a

list of personal property, so if we can refer to the next

page. Could you read to the jury what personal property was

listed in the letter?

A     "List of the personal property lost: Dining set with

four chairs, $250; hutch, $100; two dressers, $100; one desk,

$199; coffee table, $25; couch and loveseat, $150; 26-inch

flat screen TV monitor, Panasonic, 399; queen bed and frame,

275; nightstand, $50; two suits, $400; miscellaneous clothes,

$200; one Sensor XL1 video camera and tripod, $500;

approximately 75 DVDs and player, Emerson, $300; a Dell

Panasonic 2 coordinator used, $125."

Q     Could that be a Dell Pentium 3 computer?

A     Yeah, that could be computer.

Q     Okay. And going back to the first page again where --

the second paragraph where Mr. Olsen states, "I entered into a

lease on 5/20/11 moving my personal property in on the 21st.

The property manager Dean Richey signed the document and gave

46

1    me the keys."

2              Now, was there a lease submitted as well with a

3    signature on it that purported to be a Dean Richey?

4    A    Yes.

5    Q    Is that the third page?

6    A    Yes.

7              MR. MOHLHENRICH:  And publishing that up on the ELMO

8    to the jury.

9    Q    (By Mr. Mohlhenrich) Can you please read the amount of

10   the deposit and the amount of the rent paid in that?

11   A    Amount of the deposit is $300, rent paid was 375 with a

12   $25 key deposit.

13   Q    What date was this lease supposedly signed?

14   A    May 20th, 2011.

15   Q    And is there a signature in the property manager/owner

16   block?

17   A    Yes, Dean Richey.

18   Q    That appears to be a Dean Richey?

19   A    Yes.

20   Q    Now, what did -- how did FEMA process Mr. Olsen's

21   application after he submitted those documents?

22   A    Well, we issued the inspection.  Let me get back to the

23   other page.

24   Q    The inspection took place on June 21st, you already

25   testified, so what did FEMA do after he submitted that

47

1  document?  I'm sorry.  Did Mr. Olsen return and submit

2  anything else?  Referring you to July 20th of 2011.

3  A    Yes, he returned to DRC, this time verified all critical

4  data.  "App furnished proof of occupancy."  It's a rental

5  lease.  "App letter of explanation about lease agreement.

6  Letter from the property manager stating app did have a lease,

7  had deposited money on May 20th.  App was given keys to DD on

8  that date and email address for property manager furnished by

9  the applicant."

10  Q    Now, are those -- based on those entries, are those

11  statements the defendant would have made to the FEMA person

12  who was assisting him?

13  A    Yes.

14  Q    And what's that person's name?

15  A    Mary Farrell.

16  Q    And referring you to Exhibit No. 28, are those the

17  documents that the defendant submitted when he entered the

18  DRC?

19  A    It's the lease, his letters, a letter from Dean Richey

20  from Yahoo.

21  Q    Those are the documents that were submitted there that

22  were referenced in that contacts report?

23  A    Yes.

24          MR. MOHLHENRICH:  Move to admit Exhibit 28.

25          MR. RISLEY:  No objection, Your Honor.

```
 1              THE COURT:  Government's Exhibit 28 will be

 2   admitted.

 3              MR. MOHLHENRICH:  And publishing this up on the ELMO

 4   starting with the fourth page since the first couple of pages

 5   are cover sheets.

 6   Q    (By Mr. Mohlhenrich) This was a copy of the same lease

 7   that was in the last submission by the defendant?

 8   A    Yes.

 9   Q    And the next page, is that a copy of the same letter that

10   was in the last submission by the defendant?

11   A    Yes.

12   Q    And looking at the next page -- well, actually, let me

13   skip to the page after the next page because it looks like

14   that's -- this came first in time.  Is that a cover email that

15   Mr. Olsen submitted?

16   A    Yes.

17   Q    And could you read the text of that cover email?

18   A    On the last one?

19   Q    Yes.

20   A    "Sorry to hear about your trouble with FEMA.  I enclosed

21   a letter as an attachment using MS Word.  I hope this

22   satisfies everyone as I have moved out of Missouri since most

23   of the properties I was looking after were destroyed in the

24   tornado," signed Dean Richey -- or not signed by but printed

25   Dean Richey.
```

49

Q    Thank you.  Going to the page after that, is that another
declaration and release that bears Mr. Olsen's signature?

A    Yes, it is.

Q    What's the date of this declaration and release?

A    7/20, 2011.

Q    And now going back to the page that was before that cover
email, is that -- are you able to read something that small?

A    I can try.

Q    If you can.  If not I'll publish it to the jury myself,
whichever you prefer.

A    "My name is Dean Richey and for the past several years I
have worked for numerous property" something.

Q    That's okay.  I'll publish it to the jury because it's a
little bit difficult to read.

     "To whom it may concern."  The date on the letter is
July 20th of 2011.  "To whom it may concern.  My name is Dean
Richey and for the past several years I have worked for
numerous homeowners, property management companies and
apartment complexes around the Joplin, Galena and Baxter
Springs areas.  I do maintenance, repairs, security, rent
collection, and leasing.  I have recently relocated to the
Baxter Springs area of Kansas.  One of the properties I
maintained was located at 2305 South Virginia Avenue in
Joplin, Missouri.  On the 20th of May last, I signed the lease
agreement with a Mr. Scott B. Olsen for the amount of $375 per

50

month with the negotiated deposit amount of $300.  This is a

reduced amount based on the cleaning and painting of the rooms

that Mr. Olsen agreed to undertake.  The monies were received

by me and the 20th and the keys were given to Mr. Olsen.  The

lease was to be for one year and occupancy prior to the 1st of

June was authorized as long as the utilities were transferred

into Mr. Olsen's name no later than May 31st.  I returned to

the property on the 21st, Saturday, to check on the progress

of the painting and witnessed Mr. Olsen moving his personal

property into the residence.  The residence was subsequently

destroyed on Sunday the 22nd of May, 2011, by the F5 tornado

that struck Joplin.  I hope this clarifies Mr. Olsen's

resident status and the monetary arrangement surrounding the

rental.  Respectfully, Dean Richey," and has an email address

richey.dean@yahoo.com.

Now, based on these statements, what further actions

did FEMA take?

A    The caseworkers started making phone calls to the linked

case, to the person that was the actual owner for that

address.  And also there was no phone number for Dean Richey.

Q    And moving back a second, you referenced a linked case.

What do you mean by a linked case?

A    When people register and they register for the same

address, they link up, which means nobody's going anywhere

until we resolve that duplication, is what I call it.  So what

51

1  we had was we had the owner of the property, also another
2  household member, also Mr. Scott Olsen all linked to that same
3  address, because we don't want to duplicate benefits.
4  Q    Okay.  And when there are linked cases what investigative
5  measures does FEMA take in order to verify when more than one
6  person is claiming for a given dwelling?
7  A    We have to make phone calls, talk to the applicants, see
8  what the situation is.  For instance, you can have a
9  landlord/tenant relationship.  So we would always be making
10 calls to resolve those situations.
11 Q    Now, without referring to any specific statements that
12 people other than Scott Olsen made to FEMA personnel, does the
13 record indicate that phone calls were made to research this?
14 A    Yes.
15 Q    And based on -- after those phone calls were made, what
16 determination did FEMA make regarding the status of
17 Mr. Olsen's application?
18 A    Ineligible, no primary residence.
19 Q    Did Scott Olsen then contact FEMA again on July 27th of
20 2011 to inquire about his application?
21 A    Yes.
22 Q    What was he informed at that time?
23 A    That he was not eligible.
24       MR. MOHLHENRICH:  Now, at this point, Your Honor, I
25 would move to -- because as the defense has correctly pointed

                                52

out, there are statements from other individuals on the third

page of that contact sheet which would be inadmissible

hearsay, so the government moves to admit pages 1 and 2 of

Exhibit No. 21 into evidence.

MR. RISLEY:  One second, Your Honor.

THE COURT:  Sure.

Exhibit 21?

MR. MOHLHENRICH:  Twenty-one, Your Honor, yes.

MR. RISLEY:  No objection.

THE COURT:  Thank you.  Pages 1 and 2 of Exhibit 21

will be admitted.

MR. MOHLHENRICH:  Now I'm going to publish page 1

for the jury.

Q    (By Mr. Mohlhenrich) Just to walk the jury through this

in case they request to see this exhibit later on in

deliberations, the first entry there it appears to be -- I

need to blow this up a little bit, looking at the date, that

was July 10th -- or, I'm sorry, June 10th of 2011?

A    Yes.

Q    And Mary Farrell would have been the FEMA representative

who had the contact with whomever it is that's listed in the

entry, in this occasion, Mr. Olsen?

A    Correct.

Q    The summary text, what is that?

A    That would have been text she would have entered for her

53

1    conversation with the applicant.

2    Q    Okay.  And then the contact text, what procedure is

3    normally used when someone processes that information?

4    A    I'm not sure.

5    Q    Would somebody come in and tell the FEMA worker something

6    and then the FEMA worker would enter something into a

7    computer?

8    A    Correct.

9    Q    That's how it gets in there?

10   A    They're normally sitting right across from them and as

11   they're talking they're entering this data.

12   Q    Okay.  So, "App stated he was in the process of moving

13   into the house when the storm hit."  The app means the

14   applicant?

15   A    Yes, sir.

16   Q    And, "App stated he lost all of his video production

17   equipment he used in the business, furniture and other PP."

18   Does PP mean personal property?

19   A    Personal property.

20   Q    "App stated no renter's ins."

21   A    Insurance.

22   Q    "App stated person sharing house with has not been seen

23   since storm and utilities were in other person's name."  Then,

24   "App furnished letter to clear up possible duplication of

25   address.  Routed app to IRS."  What does that mean?

                              54

1    A    In a disaster recovery center they have the American Red
2    Cross, they have IRS, they have Department of Human Services.
3    They have a lot of different entities in there for people to
4    visit.  So when a person comes in, we want to make sure they
5    go to all of those areas for assistance, mitigation, things
6    like that."
7    Q    Then looking at the next entry, was that on June 13th of
8    2011?
9    A    Yes.
10   Q    And Michelle Wall was the FEMA employee?
11   A    Yeah.  What happens is at a recovery center the documents
12   that are submitted by an applicant are normally sent to the
13   JFO, which is the Joint Field Office which is the big office
14   in the field in a disaster, and from there the documents are
15   submitted to the mailroom.
16   Q    Okay.
17   A    Because recovery centers, some of them don't have faxing
18   capabilities.
19   Q    Looking at the July 9th entry of 2011, via Eva McDonald
20   Russo, it says DR6 –– in the contacts text, "DR6 verified
21   critical info."  What does that mean?
22   A    Well, any time an applicant wants –– in their file,
23   whether they call the help line, whether you go into a DRC, we
24   have certain information that we have to verify to make sure
25   that you're the person that actually owns that file.  We would

55

be asking for verification of a Social Security number, your

damaged dwelling address, your current phone number, your

mailing address.  Those are answers that you would have to

give us and they would have to go file or you wouldn't get

into the case.

Q    So somebody has to prove who they are when they come in?

A    Yes.

Q    Then after that it says, "App stated he had no renter's

ins."  That means insurance?

A    Yes.

Q    "App states he moved into the rental apartment on May

21st with all his belongings.  App states he lost everything

due to the tornado.  App never received FEMA inspection.  App

also states there is nothing left at the damaged dwelling.

Everything has been removed."  And then it refers to a letter

that he submitted.  So were those comments something that a

FEMA person would type into the system and would they then

take the letter and process it?

A    Yes.

Q    Then looking at the entry on July 17th of 2011, what is

that an indication of is happening?

A    He has submitted an appeal letter.  And Patricia Lundey

works in the appeals department so she -- this is a contact

that was made.  She called -- let's see.  No, he called

wanting information on his appeal.  "Info verified.  No

1   changes.  App calling about status because when he calls

2   automated it tells -- it says ineligible but when he goes to

3   the DRC, they tell him it's in the appeals queue."

4   Q    That's all Greek to me.  But the statements down there

5   where it says, "Went through the documents sent in and advised

6   him to get phone number of property manager and find,"

7   something, "in his name at that address to show he was living

8   there.  All utilities to be changed over on 5/23, 2011, but

9   then the disaster and nothing was left to have power to."

10            So is that a statement from a FEMA person that he

11  needed to provide some additional information?

12  A    Yes.  She's trying to give him instructions on what we

13  need in order to prove occupancy.

14  Q    Then the next entry is on 7/20 and that's when he

15  returned with those documents, the letter of explanation?

16  A    Right.

17  Q    And was there a property manager's phone number in the

18  documentation that he submitted?

19  A    No.

20  Q    Turning your attention now to let's say for a moment that

21  this claim had been authorized or claims in general.  When

22  they are authorized, does FEMA use any kind of standard amount

23  to determine or standard list to determine what individuals

24  can be compensated?

25  A    Yes.  Our pricing is made up by RSMeans.  It's a

                                57

1  construction calculation that calculates the price of certain
2  items according to measurement location.
3  Q    Okay.  I'm handing you -- or I just handed you Exhibits
4  No. 16 and 17 for identification.  Can you tell the jury what
5  Exhibit No. 16 is?
6  A    It's the comment report from the events log in the file.
7  This one?
8  Q    No, I'm sorry.  It's Exhibit No. 16.  And I have too many
9  pieces of paper in front of you so let me take some of these
10 away to simplify things.  Here's Exhibit 16 and 17 and let the
11 record reflect that I'm retrieving the other government
12 exhibits at this time.
13 A    This is fair market rent for 2011 for the county of
14 Jasper.
15 Q    And what is Exhibit No. 17?
16 A    This is the same thing.  This is in our files.  This is
17 in our disaster setup.  It just lists the bedroom fair market
18 rates for each county in the declaration.
19 Q    Okay.
20        MR. MOHLHENRICH:  Move to admit Exhibits No. 16 and
21 17.
22        MR. RISLEY:  No objection, Your Honor.
23        THE COURT:  Government's Exhibit 16 and 17 will be
24 admitted.
25        MR. MOHLHENRICH:  I'm publishing to the jury once

again the page from Exhibit No. 27 that the defendant

submitted to FEMA as a list of the personal property that he

claims to have lost.

Q    (By Mr. Mohlhenrich) Did you take this -- the property

listed on this exhibit and determine what items of property

would be compensible and how much the defendant would have

received?

A    Yes.  Based on the appeal letter that was received, I

calculated what he could have been eligible for had he proven

occupancy and it was verified by the inspection.

Q    What amount would that have been?

A    It was just over $5,000 including two months' rent at

fair market rate which was $4,000 for the personal property

and the rest of it would be the rent.

Q    A little bit over 5,000?

A    Like $5300, something like that.

Q    That number is a little bit different than what I had

heard before.  Is there something that might refresh your

recollection as to exactly what that number is, perhaps an

email that you sent about that very subject?

A    Yeah, but I don't have it.

Q    Handing the witness --

A    Too much to remember.

Q    -- a document.  Could you look that over --

A    Yes.

59

1  Q    -- and look up when your recollection has been refreshed

2  and I'll take that back from you.

3  A    It was 42 --

4  Q    Don't testify because we have rules of evidence.  But if

5  you can look and see if your recollection is refreshed by that

6  document and then if you can -- I'm retrieving the exhibit

7  from the witness.  If you can tell the jury how much that was?

8  A    $4200 for the personal property and it was

9  $5100-something for the total.

10  Q    Okay.  Thank you.

11          Regarding the definition of a primary residence and

12  what it's considered to be, could you tell the jury what FEMA

13  considers to be a primary residence?

14  A    A primary residence --

15          MR. RISLEY:  Objection.  Approach?

16  (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

17  WERE HAD:)

18          MR. RISLEY:  My objection would be that there is a

19  specific Code of Fed Reg, 44 CFR 206.211 defines primary

20  residence for the code, and I'm not sure what she's going to

21  testify to but that would be the best evidence, not what she

22  testifies is her understanding of it.  So I would object to

23  her providing her definition of it other than what is in the

24  Code of Federal Regulations for FEMA.

25          THE COURT:  What's your position?

60

1          MR. MOHLHENRICH:  I can certainly hand those

2     exhibits to the witness and have her admit them.

3          THE COURT:  All right.  Do it.

4          MR. MOHLHENRICH:  Thank you.

5     (PROCEEDINGS RETURNED TO OPEN COURT:)

6     Q    (By Mr. Mohlhenrich) I'm handing you Government's

7     Exhibits No. 7 and 8.  Could you please look at those and

8     tell me what they are?

9     A    Exhibit 7 is a CFR Code of Federal Regulations that can

10    be found anywhere, library, anywhere.  It's open to anybody to

11    read.  It's our codes that we go by, the definitions, housing,

12    assistance, what assistance means.  It's just our law.

13    Q    Those are the CFRs that FEMA uses?

14    A    Correct.

15         MR. MOHLHENRICH:  Move to admit Government's Exhibit

16    No. 7 and 8.

17         MR. RISLEY:  Could I see 8 real quick?  Sorry.

18         THE WITNESS:  No. 8 is just eligibility.

19         MR. RISLEY:  No objection, Your Honor.

20         THE COURT:  Government's Exhibits 7 and 8 will be

21    admitted.

22    Q    (By Mr. Mohlhenrich) Once again now, what does FEMA

23    consider to be an individual's primary residence?

24    A    It's a home that you occupy more than six months out of

25    the year.

                                   61

```
1   Q    Can it also be a place where someone is living if they
2   had been there for less than six months?
3   A    Possibly.
4   Q    Under what circumstances?
5   A    You just moved in.
6   Q    Thank you.
7   A    But you have to have proof is the main thing.
8   Q    Thank you.
9        And, finally, if Scott Bradley Olsen had managed to
10  prove that he had just moved into 2305 Virginia Avenue, would
11  FEMA have paid out money in the amount that you just testified
12  to?
13       MR. RISLEY:  Objection, Your Honor.
14       THE COURT:  Objection overruled.  I'm going to
15  permit it.
16  A    There's some other things to take into account.  He was
17  linked with other occupants of that address.  That would have
18  to be resolved first.  Was there a landlord/tenant
19  relationship?  I'm speculating on what it would have been.
20  Had he been eligible, we would have had to get with the
21  landlord, was there a landlord/tenant relationship.
22  Q    (By Mr. Mohlhenrich) Right.  But I'm saying if he had
23  managed to prove it to FEMA's satisfaction that he had moved
24  in, would he have been paid money in the amount that you
25  testified?
```

62

1   A    Personal property, probably.

2   Q    And --

3   A    The rent would be what we would be trying to find

4   landlord/tenant relationship.  We pay one rental check per

5   household.

6   Q    What was the personal property portion of that?

7   A    Clothes, bedroom, kitchen, bath.  That was basically it.

8   Q    Approximately what amount?

9   A    $4200.

10  Q    Thank you.

11         MR. MOHLHENRICH:  Nothing further.

12         THE COURT:  Thank you.

13         You may cross-examine.

14         MR. RISLEY:  Thank you, Your Honor.

15                       CROSS-EXAMINATION

16  BY MR. RISLEY:

17  Q    Hi, ma'am.  My name is Brian Risley.  I represent the

18  defendant.  Have we ever met or talked before?

19  A    No.

20  Q    Okay.  You testified earlier about Exhibit 20 which is

21  the application or registration for disaster assistance?

22  A    Yes.

23  Q    Do you recall that or do I need to bring it to you?

24  A    I think I recall it.

25  Q    Okay.  This is the exhibit you previously discussed was

63

1    Mr. Olsen's application for assistance?

2    A    Yes.

3    Q    And I think your testimony was that would have been

4    filled out one of three ways, either he called online or

5    phoned it in or met with somebody and they keyed in the

6    information; is that correct?

7    A    Possibly, yes.

8    Q    Okay.  I believe your prior testimony was that with

9    regard to the address he listed under No. 8, under the damaged

10   property he listed 2305 Virginia; is that correct?

11   A    Correct.

12   Q    But he also listed a mailing address of 410 South Wall?

13   A    Yes.

14   Q    And when it said, "Is the address listed in No. 8 your

15   primary residence," the answer was no?

16   A    Correct.

17   Q    Is that correct?

18   A    Correct.

19   Q    I believe you also testified that there was procedures he

20   would be provided that would tell him how to change his

21   application; is that right?

22   A    Well, he would get help after a disaster.  The

23   applicant's guide, you know, that kind of gives you

24   instructions on what to do.  But in that guide it also states

25   that secondary homes are not addressed.

64

```
 1   Q    But my point is I think the FEMA Applicant Assistance
 2   Document, Help After a Disaster, is that the document that
 3   helps explain if you need to change an application or things
 4   of that nature?
 5   A    Right.
 6   Q    To your knowledge was this application ever changed?
 7   A    Was it ever changed?  No.
 8   Q    So Mr. Olsen never came in and said, "We need to change
 9   the address listed in No. 8 as primary residence to yes"?
10   A    No, but see what you have there is the original
11   registration.  That doesn't change.  That's your original.
12   That's what you said when you registered.  Now, can it be
13   changed?  Yes.  But it would be changed through comments and
14   contacts and letters going out to him.  We would not go back
15   to the original registration and change anything on that.
16   That's a record.
17   Q    All right.  So whatever the comments say regarding the
18   change of residence, that's what they would be?
19   A    Correct.
20   Q    Okay.  You testified earlier, though -- you testified
21   about the inspector.  Do you remember who the inspector was in
22   this case?
23   A    No.
24   Q    If I told you it was Mark Parr, does that name ring a
25   bell?
```

65

```
 1    A    No.  We don't know the inspectors.

 2    Q    Do you recall during your previous testimony on direct

 3    testifying about the comments made by the inspector?

 4    A    Right.

 5    Q    That was on June 21st of 2011?

 6    A    I believe so.  Correct.

 7    Q    And, again, during that time it's listed that it's -- it

 8    states not primary residence; is that correct?

 9    A    Correct.

10    Q    And it said the app did not reside at DD at the time of

11    the -- what is DR?

12    A    Disaster -- Damaged Residence.

13    Q    So that's what the applicant told the inspector at that

14    time?

15    A    Right.

16    Q    That was three or four weeks after he filled out the

17    application; is that correct?

18    A    Not sure exactly the time frame.

19    Q    But June 21st, May 26th, so three or four weeks?

20    A    Uh-huh.

21    Q    That testimony is consistent with that's not his primary

22    residence; isn't that true?

23    A    Right.

24    Q    Okay.  Have you ever seen pictures of 2305 Virginia?

25    A    Yes.
```

66

1   Q    All right.  Do you know it's a red house?

2   A    I don't recall what color it was.  I just took a glance

3   at it.  That's not normally something I see.

4   Q    But it was a house?

5   A    Yes.

6   Q    The notes made on July 9th referencing statements that

7   apparently Mr. Olsen made to Eva McDonald Russo keeps talking

8   about he moved into a rental apartment, things of that nature.

9   Do you see that?

10  A    Yes.

11  Q    Do you know why it says apartment?

12  A    No.

13  Q    So it's possible either he got it wrong or she got it

14  wrong?

15  A    Possible, yes.

16  Q    You have no way of knowing?

17  A    Correct.

18  Q    You also know that Wall Street actually is an apartment?

19  A    Said what?

20  Q    His address on Wall Street actually is an apartment?

21  A    Yes, I saw that part of it.

22  Q    Again, it's possible it could be a mistake on somebody's

23  end?

24  A    Yes.

25  Q    And the letter he submitted talks about a white house

67

```
 1   that he had rented; do you remember that?
 2   A    No.
 3   Q    The letter of June 9th.
 4            There in the second line he said, "Co-renting a
 5   white, single-family home"; is that correct?
 6   A    Yes.
 7   Q    You never personally spoke to Mr. Olsen at any time; is
 8   that correct?
 9   A    No.
10   Q    Now, you have no idea whether or not he lost any personal
11   property during this tornado?
12   A    No.
13            MR. RISLEY:  Thank you.
14            THE COURT:  Redirect?
15            MR. MOHLHENRICH:  None, Your Honor.
16            THE COURT:  May this witness be excused?
17            MR. MOHLHENRICH:  Yes, she may.
18            THE COURT:  Thank you.
19            Do you have another witness?  We've only been going
20   an hour and 15 minutes.
21            MR. MOHLHENRICH:  The government would request a
22   brief break, Your Honor.
23            THE COURT:  Okay.  Let's take a short recess.
24            (Court reads recess instruction to the jury.)
25            THE COURT:  Let's take 15 minutes, please.
```

68

Everyone please rise while the jury recesses.

1                    (Court stands in recess at 2:20 p.m.)

2                    (Jury enters courtroom at 2:39 p.m.)

3                    THE COURT:  Please call your next witness.

4                    MR. MOHLHENRICH:  Government next calls Mr. Mark

5       Parr.

6       MARK PARR, GOVERNMENT WITNESS, SWORN:

7                              DIRECT EXAMINATION

8       BY MR. MOHLHENRICH:

9       Q    Good afternoon, Mr. Parr.  Could you please tell the jury

10      who your employer is or what your job is?

11      A    I'm a contractor with Parsons Brinckerhoff and my job is

12      to do federal disaster inspections.

13      Q    You're actually an independent contractor, aren't you?

14      A    Yes, I am.

15      Q    How long have you been an inspector?

16      A    Seventeen years.

17      Q    And all of that was doing inspections for FEMA?

18      A    Yes.

19      Q    And what are your duties and responsibilities as an

20      inspector?

21      A    Basically to go out and do the inspections for the

22      applicants.

23      Q    What's the purpose of the inspections?

24      A    To possibly get the applicants grant money to help them

                                      69

1    to rebuild their personal property and amenities.

2    Q    How many disasters have you been to in the course of

3    your -- how long did you say you were doing it?

4    A    Seventeen years.  Just over a hundred.

5    Q    Just over a hundred.  And did you -- how are you

6    compensated?

7    A    By the inspection.

8    Q    Per inspection.  Does it matter whether you recommend

9    that they receive money or not receive money?

10   A    No.

11   Q    It's just a flat fee?

12   A    Yes.

13   Q    Now, what is the normal procedure when you get an

14   inspection ordered?  What do you normally do?

15   A    When they get the inspections to me and after downloading

16   it into my work computer, it's got the names, addresses and

17   phone contact numbers of the applicants.  I call them and set

18   up the appointments.

19   Q    Okay.  And in conducting an inspection, you need to make

20   a determination as to whether something is a primary residence

21   for an individual.  Why is that important?

22   A    Well, because there's different awards for those type of

23   inspections.  I cover the grant program which typically

24   doesn't cover non-permanent.

25   Q    Now, you don't have any specific recollection of

70

1    conducting an inspection with Mr. Scott Olsen, do you?

2    A    No.

3    Q    Do you remember him seated over there at counsel table?

4    A    No.

5    Q    But have you reviewed the FEMA records in connection with

6    this inspection?

7    A    Some, yes.

8    Q    And you did conduct that inspection?

9    A    Yes.

10   Q    And I'm showing you Exhibit No. 22.  That's -- that is

11   the first page of a FEMA contacts report.  Could you please

12   turn to the entry for June 21st of 2011 where it says

13   Inspector Comment?

14   A    Okay.

15   Q    Is that information that you would have personally input

16   into the FEMA system?

17   A    Yes.  It's got my inspector ID number.

18   Q    Your inspector ID number.  What is that?

19   A    P01265.

20   Q    What comments did you place in the system regarding the

21   June 21st, 2011, inspection?

22   A    The not primary residence comment, which is required for

23   those types of inspections, and then some general information

24   here about what the applicant was concerned about.  Under that

25   not primary residence, that would be grant program that FEMA

1    still would like to know.

2    Q    What did you record?

3    A    As far as comments out?

4    Q    Yes.

5    A    Okay.  "Applicant did not reside at DD at time of

6    inspection -- " or time of DR.  "Temporary storage,

7    self-employed business items equals cameras, film, movies,

8    DDA," which is damaged dwelling address.  "App stated no

9    damage to primary residence equals mailing address."

10   Q    Okay.  Now, when you say, "App stated no damage to

11   primary residence equals mailing address," is that -- would

12   you have made that entry based on a comment that the applicant

13   made to you?

14   A    Yes.  Or a question I would have asked him, yes.

15   Q    Based on the information provided, self-employed,

16   business item, cameras, film, movies at damaged dwelling

17   address and no damage to primary residence, would you have

18   conducted a full inspection of the property?

19   A    No.

20   Q    Now, had an applicant stated that they were moving into a

21   place and had lost personal property, would you have handled

22   the inspection differently?

23   A    That's a possibility.  I would have consulted the

24   guidelines at that point.

25   Q    Thank you.

```
 1              MR. MOHLHENRICH:  Nothing further.

 2              THE COURT:  Thank you.

 3              You may cross-examine.

 4              MR. RISLEY:  Thank you, Your Honor.

 5                        CROSS-EXAMINATION

 6   BY MR. RISLEY:

 7   Q    Afternoon.  My name is Brian Risley.  I represent the

 8   defendant.  Have we ever talked before today?

 9   A    No.

10   Q    Just right now?

11   A    No.

12   Q    And as part of your process in this, would you have

13   reviewed the application filled out by Mr. Olsen?

14   A    No, just what I received in my computer that was

15   downloaded to me.  Is that what you mean as far as the

16   addresses and things?

17   Q    Yes.

18   A    Yes.

19   Q    So if he filled out an application stating that 2305

20   Virginia was not his primary residence, you wouldn't know

21   that?

22   A    Well, I -- I don't get all the background information on

23   the application.  I get the damaged dwelling address and I get

24   mailing address, basically, and phone contact number.  That's

25   about the general information.
```

73

```
1   Q    Do you remember what his mailing address was?

2   A    No, I don't.

3   Q    If I show you the application, might that refresh your

4   recollection as to his mailing address?

5   A    It's a possibility.  It's been approximately two years

6   ago but -- it doesn't.  I can't recall.

7   Q    Okay.  You weren't shown this prior to talking to

8   Mr. Olsen?

9   A    No.

10  Q    How did you -- did you see him face-to-face or was it

11  over the phone?

12  A    It would have been face-to-face.  We were out at the

13  site, yeah.

14  Q    At 2305 Virginia area?

15  A    The damaged dwelling address.  The damaged dwelling

16  address, yeah.

17  Q    Just so I'm clear, he told you that was not his primary

18  residence?

19  A    Yeah.  I would have to ask that question.

20  Q    He told you he had a different primary residence?

21  A    It would have been asked -- by the comment there I would

22  have asked him about the mailing address, if that was his

23  primary residence or he could have said that the -- a

24  different address was his primary and it would have been the

25  mailing address.
```

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 74 of 122

1  Q    But your note, "App stated no damage to primary

2  residence," you would have took that as his mailing address?

3  A    Because then I put the "equals mailing address" on there,

4  yeah.  That showed it was a mailing address that I questioned

5  him about.

6  Q    You were at 2305 Virginia and there was obviously damage

7  there, correct?

8  A    Yes.

9  Q    But he told you that was not his primary residence?

10 A    That's what the comments suggest.

11 Q    That would have been per this June 21st, 2011?

12 A    Yes.

13 Q    Thank you.

14         MR. MOHLHENRICH:  No redirect.

15         THE COURT:  May this witness be excused?

16         MR. MOHLHENRICH:  Yes, Your Honor.

17         THE COURT:  Thank you, Mr. Parr.  Thank you for your

18 attendance.  You're free to go.

19         Call your next witness.

20         MR. MOHLHENRICH:  Government calls Special Agent

21 Matt Niezgoda, please.

22 MATTHEW NIEZGODA, GOVERNMENT WITNESS, SWORN:

23                    DIRECT EXAMINATION

24 BY MR. MOHLHENRICH:

25 Q    Special Agent Niezgoda, can you please tell the jury what

                                   75

1  you do for a living?

2  A    Yes.  I'm a special agent with the Department of Homeland

3  Security, Office of Inspector General, Chicago field office.

4  Q    We'll try not to hold the Chicago part against you.

5              Is it part of your job to travel around the country

6  in certain regions helping with investigations?

7  A    Yes.  We're responsible for eight states in the Midwest.

8  Q    And would that include the Western District of Missouri?

9  A    Yes.

10 Q    Were you the lead case agent on this particular

11 investigation?

12 A    Yes, I was.

13 Q    And in connection with those duties, was there ultimately

14 an indictment of Mr. Olsen?

15 A    There was.

16 Q    And did you place him under arrest?

17 A    Yes.  I arrested Mr. Olsen May 15th of 2012.

18 Q    Now, following his arrest, did you interview Mr. Olsen?

19 A    Yes, I did.

20 Q    And can you please describe for the jury what procedure

21 you used to interview him?

22 A    Yes.  Initially I advised Mr. Olsen of his Miranda rights

23 since he was under arrest.  Mr. Olsen agreed to waive his

24 rights and answer questions and initially I presented

25 Mr. Olsen with several documents from his FEMA file which

76

1   included his application, one of the declarations and release

2   and several of the handwritten and typewritten documents he

3   had submitted to FEMA.

4   Q    And what did you do next?

5   A    After Mr. Olsen acknowledged that he had submitted these

6   to FEMA, that he recognized them, I confronted him with the

7   fact that I had spoken to the owners of 2305 Virginia Avenue

8   previously and they had never heard of him or any individual

9   named Dean Richey.

10  Q    What was his reaction to that?

11  A    Mr. Olsen did become agitated and made a comment to the

12  effect of he couldn't believe he'd been scammed.

13  Q    Did he elaborate on that?

14  A    He did.  He went further into it.  Initially we asked how

15  he had come to meet Mr. Richey and Mr. Olsen stated that he

16  had been contacted by a former roommate named Jasen Howard who

17  was inquiring about leasing a property together.

18  Q    And what did he say happened?

19  A    Mr. Olsen said he agreed to the proposal from Mr. Howard

20  and shortly before the tornado he and Mr. Howard went to meet

21  Mr. Richey at a house he described as the big white house near

22  the corner of 23rd and Virginia Avenue.

23  Q    How did he say that he and Jasen Howard arrived at that

24  home?

25  A    In a white Ford Econoline van, older model, which

Mr. Olsen's understanding was that Mr. Howard had borrowed from a neighbor.

Q    And what did he say he had with him in that white Econoline van?

A    All of the property on the list that he submitted to FEMA of his list of losses.

Q    And what items of property were on that list?

A    There were several, from furniture items, camera, TV, DVDs, several -- various household items.

Q    And he claimed that those items were in the white Ford Econoline van?

A    Correct.  I recall asking him what was in the van in terms of property, if it was in fact what was on the list, and he said yes.

Q    And what did Mr. Olsen say happened when he arrived at 2305 Virginia?

A    Mr. Olsen stated he intended to -- he arrived at 2305 Virginia Avenue with the intention of moving in that day; however, when they got there, Mr. Richey informed him that the property would not be vacant and ready for occupancy until Saturday, which was the Saturday prior to the tornado.

Q    So what did they do?

A    According to Mr. Olsen, he and Mr. Howard left the van they arrived in at that location with all the property in it and just waited to get the go-ahead to move in.

78

1   Q    So the story was that he left the van there parked on the
2   street?
3   A    Correct.
4   Q    How far away is his apartment on Wall Street from 2305
5   Virginia?
6   A    I believe it's approximately 2 miles.
7   Q    And at the time of your interview with him did Mr. Olsen
8   know the whereabouts of Mr. Richey or Mr. Howard?
9   A    No, he didn't.
10  Q    Did Mr. Olsen say whether he had ever been inside the
11  house that he believed that he was going to be leasing from
12  Mr. Richey?
13  A    He said he had never been inside of it.
14  Q    Okay.  Regarding your -- did you make any attempts to
15  locate either Dean Richey or Jasen Howard?
16  A    Yes, both of them.
17  Q    Were you successful in locating Dean Richey?
18  A    No.
19  Q    What methods did you use in your attempt?
20  A    Utilized databases that were available to me which
21  included FEMA's National Emergency Management Information
22  System which tracks disaster information from applicants as
23  well as various public websites such as Facebook, Google.
24  Q    Did you speak with a Dean Richey?
25  A    I did.  I located a Dean Richey who was -- who I could

79

1    loosely associate to the Joplin area, more so Springfield,

2    though, and he spelled his last name R-I-T-C-H-I-E.

3    Q    Was he the right guy?

4    A    He was not.

5    Q    Did any of the information that you gathered during your

6    search indicate any association between a Dean Richey and 2305

7    Virginia?

8    A    No.

9    Q    How about attempts to locate Jasen Howard, what did you

10   do?

11   A    Similar search, again using databases available to me and

12   public websites.

13   Q    And was that successful?

14   A    No.

15   Q    And did you uncover any information to indicate any

16   association between a Jasen Howard and 2305 Virginia Avenue?

17   A    No.  Can I add one more thing, too, for Richey?

18   Q    Yes.

19   A    There was one other attempt made to locate Dean Richey.

20   The email address that was located in Mr. Olsen's file, I

21   requested FEMA send an email to that address to see if they

22   would get a response and the message was returned as

23   undeliverable.

24           MR. MOHLHENRICH:  Thank you.  No further questions.

25           THE COURT:  Thank you.

                                80

1          You may cross-examine.

2          MR. RISLEY:  Thank you.

3                    CROSS-EXAMINATION

4     BY MR. RISLEY:

5     Q    Hello.  I'm Brian Risley.  I think we just met today; is

6     that correct?

7     A    Yes, sir.

8     Q    And did not talk prior to that; is that correct?

9     A    We did not.

10    Q    Regarding first your efforts to search for Mr. Howard,

11    did you in fact ever find any information to verify whether

12    that was a real person or not?

13    A    I did —- information I found seemed to verify there is a

14    Jasen Howard, I just couldn't physically locate him.

15    Q    Tell us how you realized there was an actual Jasen

16    Howard.

17    A    According to my search and according to my interview with

18    Mr. Olsen, I recall he told me that he and Mr. Howard had

19    previously leased a property around the 5th and Moffet area in

20    Joplin, Missouri.  Using that general area, I found a Jasen

21    Howard that had lived at —- I don't remember the exact address

22    but somewhere in the 500 block of Moffet which seemed to

23    indicate there was a real Jasen Howard.

24    Q    The difference may have been how his first name was

25    spelled; is that right?

1  A    Correctly.  I was initially working under the assumption
2  it was J-A-S-O-N and the Jasen Howard it appears I was seeking
3  actually spells his name J-A-S-E-N.
4  Q    All right.  You've reviewed the application known as
5  Exhibit 20, the application Mr. Olsen filled out as a part of
6  this; is that correct?
7  A    Yes, it is.
8  Q    Do you agree that Paragraph 12 says that, no, it's not
9  his primary residence, that being 2305 Virginia?
10  A    That was the initial information he gave, yes.
11  Q    You also just heard Mr. Parr's testimony.  In fact, you
12  questioned him during the course of your investigation to
13  confirm his testimony regarding the interview with Mr. Parr
14  and Mr. Olsen on June 21st; is that correct?
15  A    That's correct.
16  Q    Based on information you received, Mr. Olsen told
17  Mr. Parr that was not his primary residence; isn't that
18  correct?
19  A    He did, yes.
20  Q    And other than the letters that had been submitted,
21  anything else to -- the letters -- you're basically taking the
22  letters that Mr. Olsen submitted to form the basis of this
23  charge; is that correct?
24  A    It's not just the letters.  It's also the timing of them,
25  the submissions.

1  Q    But the letters don't say this is my primary residence,
2  do they?
3  A    In my experience in conducting FEMA investigations, that
4  was my assumption is that he was attempting to prove it was
5  his primary residence.
6  Q    Again, words *primary residence* appear nowhere in his
7  letters, correct?
8  A    The actual words do not, no.
9  Q    He never changed his application?
10 A    No.
11 Q    The information he provided to Mr. Parr on June 21st was
12 the same information he had filled out in the application on
13 May 26th?
14 A    I would say that's correct, yes.
15 Q    Regarding primary residence?
16 A    Yes.  Yes.
17 Q    He never denied the fact that he had a different address
18 or mailing address on Wall Street; isn't that correct?
19 A    No, he never denied that.
20 Q    As we sit here today, you have no idea whether or not he
21 lost property on May 22nd?
22 A    I do not.
23         MR. RISLEY:  Thank you.  That's all I have.
24         THE COURT:  Redirect?
25         MR. MOHLHENRICH:  Brief redirect.

83

REDIRECT EXAMINATION

BY MR. MOHLHENRICH:

Q    Mr. Olsen did try to convince FEMA that he had moved into the property, didn't he?

A    Yes.

Q    And you reviewed evidence of that with Mr. Olsen, didn't you?

A    I did.

Q    That evidence included this letter which is in evidence as Exhibit 27.  And could you read that letter to the jury, please?

A    "I, Scott Olsen, this statement accompanies my rental agreement for the home at 2305 Virginia in Joplin, Missouri. I entered into a lease on 5/20/11 moving my personal property in on the 21st of May.  The property manager, Dean Richey, signed the document and gave me the keys.  The address and contact info for him and the owner were in the house when the tornado struck.  All I have is the rental agreement receipt. The house at 2305 Virginia has also never been inspected by FEMA.  There is/was no rental insurance on personal property. Attached is a list of personal property lost."  Then his contact information follows.

Q    And attached to that letter was a list of personal property.  Did you share that list of personal property with Mr. Olsen when you interviewed him?

84

```
 1   A     Yes, I did.

 2   Q     And is all of that personal property what he claimed fit

 3   into a single white Ford Econoline van?

 4   A     Yes.  I recall asking him if the list of property he

 5   provided FEMA was what he lost in the van and he said yes.

 6   Q     A dinette set with four chairs, a hutch, two dressers,

 7   one desk, a coffee table, a couch and a loveseat, a 26-inch

 8   flat screen TV with monitor, a queen bed and frame, a

 9   nightstand.  All of that?

10   A     That's correct.

11   Q     And this is a copy of the lease that Mr. Olsen submitted

12   to FEMA.  Did you share that with Mr. Olsen when you

13   interviewed him?

14   A     I did.

15   Q     And did he confirm that he had submitted that to FEMA?

16   A     Yes.

17   Q     And that is purportedly a Dean Richey signature on that

18   lease?

19   A     That's correct.

20   Q     Okay.  And then there was another submission on July 20th

21   that Mr. Olsen made to FEMA.  Did you share that with

22   Mr. Olsen when you interviewed him?

23   A     Yes.  If there were any duplicate documents, I didn't

24   include those.

25   Q     But specifically referring to the cover email supposedly
```

```
 1   from Dean Richey at the email address, that didn't work?

 2   A    That's correct.

 3   Q    Could you read that to the jury, please?

 4   A    "Mr. Olsen, sorry to hear about your trouble with FEMA.

 5   I have enclosed a letter as an attachment using MS Word.  I

 6   hope this satisfies everyone since I moved out of Missouri

 7   since most of the properties I was looking after were

 8   destroyed in the tornado.  Best of luck to you, Richey."

 9   Q    Did he confirm he had provided that to FEMA?

10   A    Yes, he did.

11   Q    And this letter purportedly from Dean Richey, could you

12   read that to the jury, please?

13   A    Certainly.

14          MR. RISLEY:  Judge, I'd object.  Could we approach?

15          THE COURT:  It's already been read once.

16          MR. RISLEY:  I was going to object as cumulative.

17          THE COURT:  Okay.

18          MR. MOHLHENRICH:  Well, it might be –– I request a

19   sidebar, Your Honor.

20          THE COURT:  All right.

21   (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

22   WERE HAD:)

23          MR. MOHLHENRICH:  I don't think it's necessarily

24   cumulative because the government plans to ask the agent

25   whether Mr. Olsen offered any explanation for the discrepancy
```

1  between that letter and the statement that he was giving to

2  the agent at the time of the interview.

3        MR. RISLEY:  I think he can ask that without

4  rereading the whole letter he just read to them 45 minutes

5  ago.

6        THE COURT:  He could but since it's the crux of the

7  case, I'll overrule it and let him read it.

8  (PROCEEDINGS RETURNED TO OPEN COURT:)

9  Q    (By Mr. Mohlhenrich) Once again, Special Agent

10  Niezgoda, could you read the letter which you confronted the

11  defendant with at the time of the interview?

12  A    To Whom it May Concern, My name is Dean Richey and for

13  the past several years I have worked for numerous homeowners,

14  property management companies and apartment complexes around

15  the Joplin, Galena and Baxter Springs area.  I do maintenance,

16  repairs," I believe that says, "security and collection and

17  leasing.  I have recently relocated to the Baxter Springs area

18  of Kansas.  One of the properties I maintained was located at

19  2305 South Virginia Avenue in Joplin, Missouri.  On the 20th

20  of May last I signed a lease agreement with a Mr. Scott B.

21  Olsen for the amount of $375 per month with a negotiated

22  deposit amount of $300.  This is a reduced amount based on

23  cleaning and painting of two rooms that Mr. Olsen agreed to

24  undertake.  The monies were received by me on the 20th and the

25  keys were given to Mr. Olsen.  The lease was to be for one

87

year and occupancy prior to the 1st of June was authorized as long as utilities were transferred into Mr. Olsen's name no later than May 31st. I returned to the property on the 21st, Saturday, to check on the progress of the painting and witnessed Mr. Olsen moving his personal property into the residence. The residence was subsequently destroyed on Sunday the 22nd of May, 2011, by the F5 tornado that struck Joplin. I hope this clarifies Mr. Olsen's resident status and monetary arrangements surrounding the rental. Respectfully," says Dean Richey at the bottom, I believe.

Q    Did Mr. Olsen offer any explanation as to why the letter that he provided to FEMA said that he was moving in and had moved his property in, had keys and he told you he had never seen the inside of the place? Did he offer any explanation for that at all?

A    No.

        MR. MOHLHENRICH: Nothing further.

        THE COURT: Recross.

                    RECROSS-EXAMINATION

BY MR. RISLEY:

Q    According to the letter you just read, he didn't write it either; apparently Dean Richey wrote it, correct?

A    According to the signature on it, Dean Richey wrote it.

Q    The letter that he submitted on June 9th talks about a white house on the corner; isn't that correct?

88

1   A    Yes.

2   Q    2305 Virginia is a red house just off the corner; isn't

3   that correct?

4   A    I don't know its exact location relative to the corner

5   but there was also -- according to the pictures, there is

6   white paint on the house as well.

7   Q    Mr. Pyle testified it was a red house.

8   A    That is what Mr. Pyle said.

9         MR. RISLEY:  Thank you.  That's all I have.

10        THE COURT:  Thank you.  You may step down.

11        Call your next witness.

12        MR. MOHLHENRICH:  Government next calls Myrtle Pyle

13  to the stand.

14        THE COURT:  All right.

15  MYRTLE PYLE, GOVERNMENT WITNESS, SWORN:

16                    DIRECT EXAMINATION

17  BY MR. MOHLHENRICH:

18  Q    Good afternoon, Mrs. Pyle.

19  A    Good afternoon.

20  Q    Thank you for coming in.

21        Could you please tell the jury where you live now?

22  A    Where I live at this time?

23  Q    Yes.

24  A    814 Empire, Joplin, Missouri.

25  Q    And did you live at 2305 Virginia before that?

89

1   A    Yes, I did.

2   Q    And did you live there at the time of the tornado?

3   A    Yes.

4   Q    Could you please tell the jury what happened to you that

5   day.

6   A    Well, that particular afternoon my sister and I were --

7   we spent most of the afternoon on the front porch and our

8   weather sirens went off.  We went inside, watched the TV for a

9   few minutes and it looked as if it was in Kansas, you know,

10  the weather, the Doppler.  And the weather sirens went back

11  off so we figured we were pretty safe, so we went back and sat

12  on the front porch for quite some time and hollered over to

13  the neighbors who was watching the weather outside, too.  Then

14  suddenly we heard the noise and we -- it sounded much like a

15  jet engine.  We got inside and got to the basement and it hit

16  the house that quickly.  So we rode it out in the basement

17  for about 30 minutes.

18  Q    The house was destroyed as a result of the tornado?

19  A    Pardon?

20  Q    The house was destroyed as a result of the tornado?

21  A    Yes, the house was destroyed.

22  Q    How long had you lived there?

23  A    About 23 years.

24  Q    You and your husband owned it?

25  A    Yes.

90

```
 1   Q    Who else lived in the house at the time?
 2   A    My sister had come -- moved from Arizona to live with us,
 3   and her son.
 4   Q    Anyone named Jasen Howard?
 5   A    No.
 6   Q    Anyone named Scott Olsen?
 7   A    No.
 8   Q    Anyone by the name of Dean Richey have your permission to
 9   show the house to anyone who might be leasing it?
10   A    No.
11   Q    Have you ever seen the gentleman seated over there in the
12   open collar shirt at defense table before?
13   A    No.
14   Q    Finally, thinking back to the two days before the
15   tornado, did you ever see a large white Ford Econoline van
16   parked on the street in front of your -- or near your
17   residence?
18   A    No.
19   Q    Did you ever see anyone standing out in front of or near
20   your residence gesturing at it and perhaps signing any papers?
21   A    No.
22        MR. MOHLHENRICH:  No further questions.
23        THE COURT:  Thank you.
24        Cross-examination?
25        MR. RISLEY:  No questions, Your Honor.
```

|   |   |
|---|---|
| 1 | THE COURT:  May this witness be excused? |
| 2 | MR. MOHLHENRICH:  Yes, Your Honor. |
| 3 | THE COURT:  Counsel? |
| 4 | MR. RISLEY:  Yes, Your Honor. |
| 5 | THE COURT:  Thank you, Ms. Pyle, for your |
| 6 | attendance.  You're free to go. |
| 7 | THE WITNESS:  Thank you. |
| 8 | THE COURT:  Call your next witness. |
| 9 | MR. MOHLHENRICH:  Your Honor, the government rests. |
| 10 | THE COURT:  All right.  Thank you. |
| 11 | Ladies and gentlemen of the jury, with the |
| 12 | government announcing they're resting, we need to take a short |
| 13 | recess for some procedural matters. |
| 14 | (Court reads recess instruction to the jury.) |
| 15 | THE COURT:  We shouldn't be but 10 or 15 minutes. |
| 16 | Everyone please rise while the jury recesses. |
| 17 | (Jury exits the courtroom at 3:09 p.m.) |
| 18 | THE COURT:  Thank you.  Be seated. |
| 19 | Assumed you had an oral or written motion, something |
| 20 | to file. |
| 21 | MR. RISLEY:  I do, Your Honor. |
| 22 | THE COURT:  Okay. |
| 23 | MR. RISLEY:  May I be heard? |
| 24 | THE COURT:  Sure.  Go ahead. |
| 25 | MR. RISLEY:  Judge, we'd move for a judgment of |

92

1    acquittal at the close of the government's case.  I'll tell

2    you the first page just kind of goes through and lists off

3    blanket things, essentially that the information -- or the

4    evidence does not support all of the elements charged in each

5    of the offenses.

6              I would like the Court to review some case law I've

7    provided on pages 2, 3, and 4 specifically with regard to 18

8    U.S.C. 1001 which is Count 2.  I'd also like to point out to

9    the Court before I get to this, first count is 18 U.S.C. 1040.

10   That statute was enacted in 2008 and best I can tell from my

11   research, there's only been one case that has -- at least in

12   the Court of Appeals that has addressed that statute

13   specifically.  It's so new that that's all I could find.

14             THE COURT:  When did you say it was enacted?

15             MR. RISLEY:  The statute, I believe, is 2008.

16             THE COURT:  Okay.

17             MR. RISLEY:  And the case that I can tell the Court,

18   only case I could find that cites that particular statute is

19   *United States v. Hebron*, H-E-B-R-O-N, 684 F.3d 554.  That's

20   from the Fifth Circuit in 2012.  I have a copy if the Court

21   wants to review it.  I'll represent that I don't think -- in

22   that case the defendant ultimately pled guilty and I don't

23   think the facts of that case are necessarily consistent with

24   this case but the reason I bring it up is that I am citing

25   several cases which I'd like to go over briefly with the Court

93

with regard to the making of a false statement and the evidence that's required.

Several courts, including one in this jurisdiction, that have, in fact, reversed convictions based on the lack of evidence of a specific false statement. Here in this case he's been charged with essentially one thing, stating 2305 was his primary residence when, in fact, it was not. He hasn't been charged with making up a list of items that was lost or not lost, although I don't think they could prove that either. But that's the only thing he's charged with. And in charging that there are elements of 18 U.S.C. 1001 that require the making of the statement, the falsity of such statement, knowledge of the falsity of such statement, relevance of such statement to the functioning of the federal department or agency, and that the false statement was material.

My submission is the evidence shows that on at least more than one occasion he said that wasn't his primary residence. So the evidence before the Court is the application submitted to the Court on May 26th, 2011, that says that's not his primary residence, the evidence of Mark Parr who's an investigator who says this defendant told him on June 21st that was not his primary residence. Then there are a couple letters that are into evidence which talk about renting a residence but it doesn't say it's his primary residence. So my argument to the Court is the evidence so

94

far, it's all the Court has before it, what the government
stated, is insufficient. *U.S. v Moses* has held and other
courts have adopted that saying the prosecution for false
statement under 1001 or under the perjury statutes cannot be
based on an ambiguous question where the response may be
literally or factually correct. Again, here he told him it
wasn't his primary residence. They may have read some letters
in which they inferred he was trying to say that was his
primary residence but that's not what the law I believe tells
this Court. And *Moses* goes on to state –– that's *U.S. v.*
*Moses*, 94 F.3d 182, says, "An indictment premised on a
statement which on its faces is not false cannot survive."

      The case from the Eighth Circuit is *U.S. v Vesaas*,
V–E–S–A–A–S, 586 F.2d 101. Again, that's from the Eighth
Circuit 1978. It talks about a case and held that statements
taken during a deposition related to a federal inquiry that
led to charges. In that they held –– they said, "It may well
be held that the Petitioner's answers were not guileless but
were shrewdly calculated to evade. Nevertheless any special
problems arising from the literally true but unresponsive
answer are to be remedied through the 'questioner's acuity'
and not by a federal perjury prosecution."

      The last thing I would want to point out, this is
talking about several cases, *U.S. v Hixon* which is 987 F.2d
1261, *U.S. v. Gahagan*, G–A–H–A–G–A–N, that's 881 F.2d 1382,

and *U.S. v Diogo*, 320 F.2d 898.  They all state that "It is incumbent upon the government to negative any reasonable interpretation that would make the defendant's statement factually correct."

Again, the evidence they presented to you -- to this Court was an application where he says this is not his primary residence.

THE COURT:  Why do you think he applied and wanted all that money?  What do those two letters mean where he listed out all that property?

MR. RISLEY:  I understand.

THE COURT:  What is it you want?  How can he stand there and say, "I want all this money," "Oh, well, well, that's not my primary residence"?

MR. RISLEY:  Again, I think -- my argument again to the Court is that that gets into could they have charged him with something else, perhaps.

THE COURT:  Okay.  That's a good point.

MR. RISLEY:  But the only two counts they've charged him with this are that this is not his primary residence.

THE COURT:  Okay.

MR. RISLEY:  I believe the evidence indicates that they have not proven that.

THE COURT:  Good point.

What's your response?

96

1          MR. MOHLHENRICH:  The government's response is:

2    Nice try; however, the element states statement or

3    representation.  And the government's position is that it has

4    made a submissible case that the defendant was attempting to

5    represent that 2305 Virginia was his primary residence, that

6    he was in the process of moving in.  As the FEMA

7    representative, Connie Malone, testified, if someone had just

8    moved into a place, FEMA could consider it a primary

9    residence.  The defendant submitted a letter -- the government

10   believes it's a blatant forgery -- from -- purportedly from

11   Dean Richey stating that he had seen the defendant, got the

12   keys, he was moving his property in.  That's a false

13   representation, pure and simple.  The government believes

14   there is a submissible case.

15          THE COURT:  Thank you.

16          Response?

17          MR. RISLEY:  I'd just rely on the previous argument.

18   I also state if the Court wants any copies of the cases I've

19   cited, I have those for the Court.

20          THE COURT:  No.  I'm going to deny your motion.  I'm

21   going to give this to the jury.  Do you want to put on any

22   evidence before it goes to the jury?

23          MR. RISLEY:  I think yes but let me confirm.

24          THE COURT:  Let's take a short recess.  I'll check

25   with you.  I think there is sufficient evidence to present

                                    97

1   this question to the jury.  Motion for acquittal at the close
        2   of the government's case is denied.
        3           MR. MOHLHENRICH:  Thank you, Your Honor.
        4           THE COURT:  Court stands in recess.
        5           (Court stands in recess at 3:17 p.m.)
        6           THE COURT:  Now, before we call the jury, is the
        7   defendant going to testify?
        8           MR. RISLEY:  Yes, Your Honor.
        9           THE COURT:  All right.  Then we need to make a
       10   record.
       11           MR. RISLEY:  Yes.
       12           THE COURT:  Mr. Olsen, you want to step up.
       13           Mr. Olsen, do you want to raise your right hand to
       14   be sworn in to answer questions concerning your own decision
       15   to testify.  That's what I'm going to ask about.
       16           All right.  Swear him in.
       17           (Defendant duly sworn by courtroom deputy.)
       18           THE COURT:  Do you want to start or do you want me
       19   to ask?
       20           MR. RISLEY:  You can go ahead.
       21           THE COURT:  You're Scott Bradley Olsen?
       22           THE DEFENDANT:  Yes, sir.
       23           THE COURT:  You're the defendant in this case?
       24           THE DEFENDANT:  Uh-huh.
       25           THE COURT:  Your attorney just advised us that

                                     98

```
 1   you're preparing to testify; is that correct?

 2             THE DEFENDANT:  Yes, sir, it is.

 3             THE COURT:  We always make a record.  Have you been

 4   threatened or coerced or forced in any way to testify?

 5             THE DEFENDANT:  No, sir.

 6             THE COURT:  Are you testifying -- have you had

 7   sufficient time to consult with your attorney to make this

 8   decision that you want to testify?

 9             THE DEFENDANT:  On the decision to testify itself,

10   yes.  I would kind of like to go over a few more things but I

11   don't know if that's in the Court's purview to allow me that.

12             THE COURT:  I need to know if you've had enough time

13   to consult with your attorney to make the decision --

14             THE DEFENDANT:  Yes, sir.  Yes, sir.

15             THE COURT:  -- to testify.

16             Again, have you been threatened in any way?

17             THE DEFENDANT:  No, sir.

18             THE COURT:  Or forced in any way by anybody to

19   testify?

20             THE DEFENDANT:  No.

21             THE COURT:  Do you have any questions you want to

22   ask your client?

23             MR. RISLEY:  No, Your Honor.

24             THE DEFENDANT:  We're fine.

25             THE COURT:  All right.  Anything you want --
```

anything you don't understand?  You're about to testify and
after your attorney asks you questions, the government will
have an opportunity to cross-examine you.  Do you understand
that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Are you satisfied with the
representation of your attorney to this point?

THE DEFENDANT:  He has been very good.

THE COURT:  Okay.  All right.

MR. RISLEY:  I did think of one question, Your
Honor.

THE COURT:  All right.

MR. RISLEY:  You have a medical condition that
involves your feet, correct?

THE DEFENDANT:  Yeah, but my feet aren't bothering
me today.  I'm having more problems with my blood pressure.

MR. RISLEY:  You'll be able to walk up and back
without any problem?

THE DEFENDANT:  Yes.

THE COURT:  After questioning the defendant under
oath the Court determines that his decision to plead guilty
was entered into by him intelligently, knowingly and
voluntarily.  The Court finds he's advised the Court and the
attorneys he's testifying of his own free will.

Bring in the jury and we'll move forward.

100

```
 1              THE REPORTER:  Judge, you said to plead guilty.

 2              THE COURT:  Oh, I'm sorry.  I don't mean to plead

 3    guilty.  Heavens.  His own decision to testify in this case.

 4    I misspoke.

 5              (Court stands in recess.)

 6              (Jury enters the courtroom at 3:30 p.m.)

 7              THE COURT:  Reconvene from recess.  The defense may

 8    present their evidence.

 9              MR. RISLEY:  The defense would call Scott Olsen.

10              THE COURT:  Mr. Olsen, step up here to be sworn in.

11    SCOTT B. OLSEN, DEFENDANT HEREIN, SWORN:

12                        DIRECT EXAMINATION

13    BY MR. RISLEY:

14    Q    Please state your name.

15    A    I'm Scott Bradley Olsen.

16    Q    Scott, what town do you currently reside?  What town do

17    you currently reside in?

18    A    I moved to Springfield, Missouri, about a month ago.

19    Q    All right.  Where did you live before that?

20    A    I lived in Joplin, Missouri.

21    Q    Okay.  About how long did you live in the Joplin area?

22    A    About nine years.

23    Q    Okay.  And where did you live before that?

24    A    Seattle, Washington for four years.

25    Q    Are you currently employed?
```

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 101 of 122

1   A   No.  I am –- I'm on medical disability, SSI.

2   Q   And how long have you been on that?

3   A   About 30 days.

4   Q   Back in 2011 where were you living in Joplin?

5   A   410 South Wall, Apartment 23 in Joplin, Missouri.

6   Q   How long did you live at that address?

7   A   About three and a half years.

8   Q   Did you live at that address all of 2011?

9   A   Yes, sir, I did.

10  Q   Okay.  Was there ever a period of time where you planned

11  to move from that address?

12  A   Yes, there was.  Actually, two, but I was approached in

13  May of 2011 by an ex–roommate of mine who owed me money, was

14  trying to make it up, introduced me to someone.

15  Q   What was his name?

16  A   His name was Jasen Howard.

17  Q   How long had you known Jasen?

18  A   I met Jasen Howard in the summer of 2006 when we worked

19  at a company together.

20  Q   Okay.  And so where was this place at, this place you

21  were looking at?

22  A   It was on the corner of 23rd and Virginia in Joplin.

23  Q   Okay.  And do you remember what time Jasen contacted you

24  relative to the tornado of 2011?

25  A   It was a week before.

102

1   Q    So pretty close in time to the events of the tornado?

2   A    Yes.

3   Q    Did you talk with anyone else about this residence?

4   A    Yes.  He introduced me to a gentleman he said was a

5   property manager by the name of Dean Richey.

6   Q    Okay.  Where did you meet with Mr. Richey?

7   A    First time we met was a Hardee's restaurant.  It was on,

8   I think, 18th and Main in Joplin.

9   Q    Okay.  And what did he -- what was your understanding was

10  going to happen after you met with Mr. Richey?

11  A    He had like a realtor's book, pulled it out, showed me

12  some properties and one of them was within about five blocks

13  of there and it was the only one in his book that was even

14  close, so we drove over in his car, drove past the property

15  and then returned to the restaurant.

16  Q    Okay.  This house, was that on Virginia Street?

17  A    Yes.

18  Q    And did he tell you what the address was?

19  A    He told me it was 2305 Virginia, South Virginia.

20  Q    Did you ever go inside that residence?

21  A    No, I did not.

22  Q    Did you ever see the outside of that residence?

23  A    Oh, yeah, several times.

24  Q    What did it look like?

25  A    It was a white corner house probably built back in late

103

1    '20s, early '30s.

2    Q    Okay.

3    A    Wood frame.

4    Q    Did it have any red paint on it?

5    A    Not one bit.

6    Q    Did you see any house nearby with red paint?

7    A    Yes, the house next door.

8    Q    You saw a picture of Mr. Pyle's house today.  Do you know

9    if that was the same house?

10   A    It was not the house that I was shown.

11   Q    I'm talking about the house next to the house you were

12   shown.

13   A    Yes, that was the house next -- that was the second house

14   in from the corner on 23rd and Virginia.

15   Q    Okay.  What was your understanding of who was going to

16   live at this 2305 Virginia you were shown?

17   A    Initially me, within a month, maybe a little less, Jasen

18   Howard.  There was a couple of people that I worked with at

19   the Joplin Globe that were, well, pretty much in the same

20   financial state as I was, working part-time, and I figured

21   with three people in there our costs would be really low.  It

22   looked like a pretty big-size house.

23   Q    I was going to ask you, were you employed back in May of

24   2011?

25   A    I was off work due to an injury but I was employed by the

104

1    Joplin Globe newspaper.

2    Q    Okay.  What was your understanding what you would pay

3    with regard to rent on this residence?

4    A    Three seventy-five a month for the first year with a $300

5    deposit.

6    Q    Was that being split between all the parties that lived

7    there?

8    A    Yes.  Well, that didn't include the utilities.  That

9    would have to be added in.

10   Q    Okay.  So did you ever sign a lease on this residence?

11   A    I signed a temporary lease document.  I wanted a full

12   lease at the time I actually physically took possession but I

13   had a receipt that I showed to my landlord at the time who was

14   a retired judge and he said it was fine.

15   Q    This all occurred before May 22nd?

16   A    Yes, sir, it did.

17   Q    But you did not enter the residence prior to that time?

18   A    I did not have the opportunity to.

19   Q    Tell me about this property list and how it came to be

20   involved in this case.

21   A    The property listed on there is what was left over from

22   the condominium that I had out at Loma Linda when I still had

23   my film company.

24   Q    Was this property ever at 2305 Virginia or close to it?

25   A    I saw some of my possessions in a white Econoline van

105

1    that Jasen Howard said belonged to a friend of his or his

2    roommate, I can't remember which one it was. He also advised

3    me that he had a pickup truck available for my dining room set

4    and bedroom set.

5    Q    Did this property ever get moved into the residence?

6    A    To the best of my knowledge, no. I had given the keys to

7    my storage unit and he was waiting on Mr. Richey to give him

8    the keys to the house but he kept saying there was still

9    people in the house, we can't get in.

10   Q    Do you remember what day this was on?

11   A    Last time I talked to Jasen was on the 21st of May.

12   Q    And as we all know now, the tornado struck on May 22nd;

13   is that correct?

14   A    That is correct.

15   Q    All right. Did you complete an application with FEMA on

16   May 26th?

17   A    Yes, I did.

18   Q    What was the purpose in completing that application?

19   A    I'd given all my money for the next month's rent to

20   Mr. Richey and I needed assistance getting temporary rent to

21   stay in the apartment that I already had.

22   Q    All right. What about your property?

23   A    I didn't know if I was going to have any chance of

24   getting compensation for that. It wasn't until after about

25   four conversations with FEMA that they said, "Yeah, go ahead

106

1  and file it.  There's nothing wrong with filing.  You might
2  get paid for it, you might not."
3  Q    All right.  This document has already been admitted into
4  evidence.  Was this your FEMA application?
5  A    Yes, sir, it is.
6  Q    Do you remember how and when you filled that out?
7  A    The initial assignment of a number was handled at The
8  Bridge in Joplin which is a youth center.  All the different
9  agencies were there.  You couldn't talk without a FEMA number.
10 I explained what my situation was to the caseworkers in the
11 tent and they assigned me a number.
12 Q    Were you talking to somebody on the phone?
13 A    No, it was in person.  They had two or three tents set up
14 the south end of Joplin and most of the information was being
15 keyed in by FEMA employees on laptops.
16 Q    Did you key in this information?
17 A    No, sir, I did not.
18 Q    Did you tell somebody this information that was keyed in?
19 A    Yes.
20 Q    Have you reviewed this application?
21 A    Yes, I have.
22 Q    Is all the information on this application accurate?
23 A    Yes, sir.
24 Q    At any point throughout this process did you ever tell
25 anyone to change anything on this application?

107

```
 1   A    No, sir.

 2   Q    Okay.  Did you ever tell anyone that 2305 Virginia was

 3   your primary residence?

 4   A    No, sir, I did not.

 5   Q    All right.  You did submit some letters with regard to

 6   the property you had lost and the rental agreement; is that

 7   correct?

 8   A    Yes, I did.

 9   Q    You were doing that based on requests from FEMA -- or why

10   were you doing that?

11   A    Basically it was they had requested more information

12   to -- how did they put it -- to verify my claim.  And they

13   told me -- they gave me a booklet on what you could file, what

14   you could do, and they said, "Well, this is what we're going

15   to need to go to the next step and process the claim because

16   right now there's not enough information."  So I said okay

17   and I sent the first letter in.  I can't remember what the

18   first one was.  I think that was just the declaration that I

19   intended to move into the property, put money down.

20   Q    Did you follow up with the lease that you had been

21   provided?

22   A    Yes.  I -- the FEMA office six that was referred to in

23   earlier testimony was a Lutheran church about a block from the

24   apartment that I was residing.  So whenever I got a call, a

25   phone number -- a phone call or a letter from FEMA, I'd go
```

108

1   over to the Lutheran church and talk to the caseworkers there.

2   It was always somebody different.  I never got the same person

3   twice.  Every time I'd bring all the stuff that I had before

4   plus whatever they had requested now.  So we were adding onto

5   this file with different caseworkers over a couple of months.

6   Q    All right.

7          MR. RISLEY:  Thank you.  That's all I have.

8          THE COURT:  Thank you.

9          Cross-examination?

10         MR. MOHLHENRICH:  Yes, Your Honor.

11                  CROSS-EXAMINATION

12  BY MR. MOHLHENRICH:

13  Q    Good afternoon, Mr. Olsen.

14  A    Good afternoon, sir.

15  Q    So as you told Special Agent Niezgoda when you were

16  interviewed, you now believe that you were the victim of a

17  rental scam by Dean Richey and perhaps Jasen Howard as well?

18  A    Yeah.  I've done extensive research on the Internet and

19  there are hundreds of cases exactly like this.  It's

20  unfortunate that I've had to wait two years to get to talk

21  about this.

22  Q    As part of this rental scam Mr. Howard said that there

23  was this opportunity to rent room at 2305 Virginia?

24  A    Yeah, white house on the corner.  It was purported to be

25  2305 Virginia.

109

1    Q    And on the basis of that you then met with Mr. Dean

2    Richey or a person who represented himself to be Dean Richey

3    and Mr. Richey showed you the property and --

4    A    He showed me photographs first and then the property

5    afterward.

6    Q    And you indicated that you were interested in moving in?

7    A    Yes, sir.  It was a really good deal.

8    Q    Okay.  Now, following that you signed a lease or a

9    abbreviated lease form?

10   A    Yes, sir.

11   Q    Where were you when you signed the lease?

12   A    We were at the Hardee's restaurant at 18th and Main in

13   Joplin.  That's where the actual money transfer took place.

14   Q    What date was this?

15   A    It was either the 19th or the 20th.

16   Q    And this part of Exhibit 27 right here that I'm about to

17   publish up on the ELMO, this is the lease that you signed --

18   that you and Dean Richey signed?

19   A    Yes, sir.

20   Q    And you witnessed Dean Richey sign that in front of you?

21   A    Yes, sir.  And is there a witness statement in there?

22   No.

23   Q    Does not appear that there is.

24   A    Okay.

25   Q    You didn't sign Dean Richey's name to that, did you?

110

```
1   A    No, sir, I did not.

2   Q    Why isn't Jasen Howard on the lease?

3   A    He wasn't scheduled to move in for three to four weeks

4   and until he actually did and we had a full rental agreement,

5   it was just going to be between me and Dean Richey now.

6   Q    And the utilities were going to be in Jasen Howard's

7   name, though?

8   A    Most likely.  I still owed money to Empire District

9   Electric.  Once the transfer of the keys took place, then

10  technically Jasen was going to go down with me on the 23rd.

11  He probably would have had to co-sign for them.

12  Q    Didn't you say that Jasen Howard had terrible credit?

13  A    He had pretty good credit with the local utility

14  companies, though.  Better than mine.  Because when we lived

15  together all the utilities were in my name and when he walked

16  out on the lease, I ended up spending a lot of time paying it

17  off.

18  Q    Now, how did the discussion about painting come up?  You

19  got a break on the security deposit based on your willingness

20  to paint rooms.

21  A    In 2010 when Jasen returned to Joplin from wherever he

22  had been -- he tends to get in and out -- my place at 410 Wall

23  was just a mess and I was getting ready to start painting.  I

24  told him he could work off part of the money he owed me if he

25  helped me paint and patch.  And so when he offered the deal in
```

111

1  the apartment, I said, "Well, I can't do a lot of work right
2  now, got a bad hip, using a cane, can you do the painting and
3  stuff and in exchange for that I'll take some more money off
4  your bill," and he agreed.
5  Q    That was the painting to 2305 Virginia?
6  A    Yes.
7  Q    And just to be clear, you'd never been inside 2305
8  Virginia?
9  A    No, I had not.
10  Q    What rooms were going to be painted?
11  A    There were two rooms toward the back of the house.  The
12  house sat kind of on a corner and it was in the back, it was a
13  side driveway and there were like two bedrooms and a kitchen,
14  I think.
15  Q    But you'd never seen the inside of the house?
16  A    No.  I saw the outside of the house from the street and
17  from the side and photographs of it in Mr. Richey's little
18  real estate book.
19  Q    Now, you had all your property then placed in a van, the
20  property --
21  A    I had all my property in storage.  The keys given to
22  Mr. Howard, and I saw one van load of my property.  Now, I had
23  stated at least once it was going to take at least three trips
24  to get all my stuff out of there but --
25  Q    And that includes all of the property that you listed, a

112

1    dinette set with 4 chairs, a hutch, two dressers, a desk, a
2    coffee table, couch and loveseat, 26-inch flat screen TV
3    monitor, queen bed and frame, nightstand, two suits,
4    miscellaneous clothes, video camera, tripod, Pentium 3
5    computer?
6    A    Yes, things that I purchased at FFO, Office Depot and an
7    antique store in Neosho.
8    Q    And that property was in the van when you pulled up to
9    2305?
10   A    Part of my stuff was in the van.  The smaller stuff was
11   in there.  The large furniture he also told me that he had
12   somebody that had a pickup truck.  I said, "You're going to
13   need it."
14   Q    So some of this property on this list was not in the van
15   and wasn't in 2305 and you're claiming to FEMA --
16   A    I didn't know if it was in 2305 because I never went in
17   the building.
18   Q    But you're submitting a list to FEMA saying that that
19   property was lost in the tornado?
20   A    Yes, sir, I am.
21   Q    You don't know whether that's the case?
22   A    I don't know where it went after the last time I saw it,
23   which was after I gave -- before I -- well, the last time I
24   gave the keys to Jasen Howard.
25   Q    Well, you left the van there on the street.  You lived 2

1  miles away.  Did you and Jasen Howard walk back to your

2  apartment?

3  A    Jasen Howard and the van remained there.  There's a bus

4  stop two blocks off.  I took the last bus on Saturday back to

5  my apartment.  I wasn't about to try walking 2 miles, not as

6  bad as I felt.  I didn't like driving around with Jasen

7  because as far as I knew, he hasn't had a driver's license in

8  six years.

9  Q    So let me get this straight.  You meet a guy at a

10  Hardee's that you didn't know before, you agree to lease a

11  property that you've never been inside before, right?

12  A    That is correct.

13  Q    You pay the guy $675 as first month's rent and security

14  deposit.  You drive up to -- is that a yes?

15  A    Yes.  Yeah.

16  Q    You drive up to this property in a white Ford Econoline

17  van that has your property in the back of it?

18  A    No, sir.  The only time that we drove up there was when

19  we were in Mr. Richey's car, which was -- I think was a Lexus

20  or Cadillac.  It's been awhile.  Jasen Howard showed up with

21  the van.

22  Q    So he showed up at 2305 Virginia?

23  A    Yes.

24  Q    And you left your property in this van.  The last time

25  you saw it it was one street in front of 2305 Virginia?

114

1  A    On the side.  It was on 23rd.

2  Q    Did you say anything about the van to the inspector?

3  A    Mr. Parr and I, to the best of my knowledge, have never

4  met.  The only conversation we had was about 60 seconds long

5  on the telephone.  I never physically met Mr. Parr before.

6  Q    Did you ever tell him that you were moving into the

7  property?

8  A    I told him that we had been attempting to move in when

9  the tornado -- we wanted to move in when the tornado hit.

10 Q    Let's talk about this letter that you submitted to FEMA

11 purportedly from Dean Richey.  I'm talking about Exhibit 28

12 which I'm going to put up on the screen again.  It's already

13 been read a couple of times so I'm not going to read it again.

14 But this letter was provided to you by Dean Richey via email?

15 A    Yes, sir.

16 Q    And that letter said that Mr. Richey showed up on the

17 21st of May and personally witnessed you moving property into

18 the residence at 2305 Virginia, doesn't it?

19 A    That's what the letter states but that's not what

20 happened.

21 Q    And so you admit that the letter is false in that regard?

22 A    I am not responsible for the content of a letter written

23 by somebody else.  The majority --

24 Q    But, sir, that was not my question.  My question is:  You

25 admit that that letter is false in that regard, correct?

115

```
 1   A    I guess I so stipulate.

 2   Q    You admit that that letter is false?

 3   A    No, I do not admit that letter is false.  I admit that

 4   there is an error in that letter in regards to the statement

 5   you want me to address.

 6   Q    An error in that letter.  Okay.  Since there does seem to

 7   be a little bit of a disagreement about this, let me read that

 8   letter.

 9            "I returned to the property on the 21st, Saturday,

10   to check on the progress of the painting and witnessed

11   Mr. Olsen moving his personal property into the residence."

12            Is that a true statement?

13   A    No, it is not.

14   Q    "The residence was subsequently destroyed on 22nd of May,

15   2011, by an F5 tornado that struck Joplin.  I hope that this

16   clarifies Mr. Olsen's residence status and the monetary

17   arrangements surrounding the rental."

18            So he wrote in that he hopes he clarifies your

19   residence status, yes?

20   A    That's what it says.  I have no real idea what that

21   means.

22   Q    Now, you submitted this letter to FEMA, didn't you?

23   A    Yes, I did.

24   Q    You submitted --

25   A    They asked for it, yeah.
```

116

1  Q    You submitted this letter to FEMA that you know has a

2  false statement about you moving into that house?

3            MR. RISLEY:  I'm going to object, Your Honor.  It's

4  argumentative.

5            THE COURT:  I will permit it.  It's

6  cross-examination.

7  A    Can you repeat the question one more time?

8  Q    (By Mr. Mohlhenrich) You admit that you submitted a

9  letter containing a false statement that you moved into a

10  house to FEMA; true or not?

11  A    Yes, I submitted it.

12  Q    Now, you testified that you -- and turning back to

13  Exhibit No. 27 again, that Dean Richey is the one who signed

14  his name on that.  Going to focus in on the D on Dean Richey's

15  name.  Can you take a look at that?  Can you see it pretty

16  clearly now on the screen?

17  A    Looks kind of like a P but, yeah.

18  Q    Okay.  Now going to focus you in on -- and you admit that

19  you submitted the personal property list that was attached to

20  that, correct?  This form here which lists out all of the

21  property that you allegedly lost in the tornado?

22  A    Yes, sir.

23  Q    Which you don't know whether or not it was in the van?

24  A    I know some of it was in the van because I saw some of it

25  in the van.

1  Q    Let's focus in on the D in the word Dell right there.

2  You admit that you wrote that D?

3  A    Yes, sir, that's -- I wrote that.

4  Q    And you want the jury to believe that Dean Richey wrote

5  that D?

6  A    Yeah.  That's different.

7  Q    The jury can be its own arbiter of that fact.

8         Here is Exhibit 26 which is the declaration and

9  release to FEMA.  Do you admit that you signed that document?

10  A    I can verify that's both my printed and written

11  signature.  I don't specifically remember that document but

12  those are my signatures on that document.

13  Q    Looking at the statement that accompanies your rental

14  agreement, the lease that you submitted, you provided this to

15  FEMA?

16  A    Could you zoom in, please?

17  Q    I'm sorry?

18  A    Could you zoom in, please?

19  Q    Yes.  This is something you provided to FEMA?

20  A    Yes, it is.

21  Q    Okay.  Now, and you wrote that?  You wrote, "I entered

22  into a lease on 5/20/11 -- "

23  A    Could you slide that way just a little?  Thank you very

24  much.

25  Q    You wrote, "I entered into a lease on 5/20/11 moving my

118

```
 1   personal property in on the 21st of May"?
 2   A    There's an error on that page.  It should read, "I
 3   entered into a lease on 5/20/11 to move my personal property
 4   in on the 21st."  This is a clarification letter for a
 5   conversation that I had.  Sometimes I -- brain works a little
 6   faster than my hand when I'm writing.  That's an unclear
 7   statement.  It's --
 8   Q    Looking at the D in Dean Richey here, do you admit that
 9   you wrote that D?
10   A    Yeah.  I wrote this letter, yeah.
11             MR. MOHLHENRICH:  Nothing further.
12             THE COURT:  Redirect?
13                       REDIRECT EXAMINATION
14   BY MR. RISLEY:
15   Q    The email that Dean Richey sent, did you -- what was the
16   purpose in giving that to FEMA?
17   A    They needed to talk to someone that had a either
18   ownership or legal connection to the property and Mr. Richey
19   had told me that he was the contracted property manager for
20   that house.
21   Q    When you provided that to FEMA at the time, did you still
22   believe he had something to do with that property?
23   A    Oh, yeah.  I didn't find out anything different for
24   months.
25   Q    You don't believe that today, correct?
```

Case 3:12-cr-05018-DW   Document 73   Filed 10/08/13   Page 119 of 122

1  A    Oh, no.  No.  I would really like to see that guy again.

2  Q    You don't dispute the Pyles' testimony that they owned

3  that house, correct?

4  A    Oh, not at all.

5            THE COURT:  Recross?

6            MR. MOHLHENRICH:  Nothing further.

7            THE COURT:  Thank you.  You may step down.

8            Call your next witness.

9            MR. RISLEY:  Defense rests, Your Honor.

10            THE COURT:  Any rebuttal?

11            MR. MOHLHENRICH:  No, Your Honor.

12            THE COURT:  Okay.  Let's have a sidebar.

13  (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

14  WERE HAD:)

15            THE COURT:  The instructions are pretty

16  straightforward but you've got another motion to file.  We

17  need to get them in order.  I think we'll let the jury go

18  home, bring them back in the morning to get started.  Even if

19  we had our instruction conference and you got to argue your

20  case, it would be probably after 5:00 before they got it, so

21  I'm going to send them home, prepare for first thing in the

22  morning.  Is that agreeable?

23            MR. RISLEY:  Yes, Your Honor.

24            MR. MOHLHENRICH:  Yes, Your Honor.

25            THE COURT:  Okay.  Thank you.

1   (PROCEEDINGS RETURNED TO OPEN COURT:)

2          THE COURT:  All the evidence is in that you will be

3   considering during your deliberations.  It's now necessary for

4   us to take up some legal matters plus to prepare the final

5   written instructions that I will be reading to you.  Working

6   efficiently, that would probably take us to 4:15 to 4:30, then

7   I would read the instructions to you, the attorneys would make

8   their closing arguments and then you would begin deliberation.

9   So that can't happen until after 5:00, so I'm going to send

10  you home, we're going to get all that preliminary work done so

11  we can begin right at 9:00 in the morning with me reading the

12  final instructions to you, hearing the positions of the

13  attorneys and then you can begin your deliberations.

14         So with that -- I like to keep my jury informed how

15  we're progressing, why we do things.

16         (Court reads recess instruction to the jury.)

17         THE COURT:  All right.  Again, be careful about

18  listening to any radio or watch any TV news.  I don't know

19  whether there's been any coverage on it or not.  If it comes

20  on, turn the TV off or go to another station, please.  With

21  that, see you in the morning at 9:00.

22         (Jury exits courtroom at 4:00 p.m.)

23         THE COURT:  Do you have something to file?

24         MR. RISLEY:  Yes, Your Honor.  At this time the

25  defendant would move for a judgment of acquittal at the close

121

```
 1    of all the evidence.  It essentially restates the same
 2    argument I made at the end of the government's case and I
 3    won't repeat all that other than just ask the Court to give --
 4    consider granting the motion for judgment of acquittal.
 5              THE COURT:  I'll take that under advisement, if we
 6    have time to hear from you this afternoon or tomorrow morning
 7    before the jury gets here or while they're out.  I'm going to
 8    take it under advisement.  Prepare the instructions intending
 9    to give it to the jury.
10              MR. RISLEY:  Thank you, Your Honor.
11              THE COURT:  Be in recess.  Gather up your stuff.
12              MR. RISLEY:  If it matters to the Court at all, I
13    have copies of all the cases cited in the brief.
14              THE COURT:  Okay.
15              (Court stands in recess at 4:03 p.m.)
16                        END OF VOLUME 1
17
18
19
20
21
22
23
24
25
```