IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
            vs.                )   No. 12-5018-01-CR-DW
                               )
SCOTT BRADLEY OLSEN,           )   April 23, 2013
                               )
               Defendant       )   Springfield, Missouri



CRIMINAL JURY TRIAL
BEFORE THE HONORABLE DEAN WHIPPLE
UNITED STATES DISTRICT JUDGE


VOLUME 2

APPEARANCES:
FOR THE PLAINTIFF:            MR. STEVEN M. MOHLHENRICH
                             U.S. ATTORNEY'S OFFICE
                             901 St. Louis Street, Ste. 500
                             Springfield, MO  65806


FOR THE DEFENDANT:           MR. BRIAN D. RISLEY
                             LAW OFFICE OF BRIAN RISLEY
                             1200-C East Woodhurst
                             Springfield, MO  65804


COURT REPORTER:              MS. JEANNINE RANKIN,CSR,CCR,RPR
                             U.S. COURT REPORTER
                             222 N. Hammons Parkway
                             Springfield, MO  65806


Proceedings reported by stenography; transcript produced by
computer.

I N D E X

Page No.

APRIL 22, 2013

PRETRIAL RECORD . . . . . . . . . . .   5

INSTRUCTION NOS. 1-7 READ . . . . . . . .   7

OPENING STATEMENTS BY MR. MOHLHENRICH . . . . .   7

OPENING STATEMENTS BY MR. RISLEY . . . . . .   13

GOVERNMENT'S EVIDENCE

WITNESSES:

     CHARLES PYLE
     Direct Examination by Mr. Mohlhenrich  .   16

     CONNIE MALONE
     Direct Examination by Mr. Mohlhenrich  .   23
     Cross-Examination by Mr. Risley  . . .   63

     MARK PARR
     Direct Examination by Mr. Mohlhenrich  .   69
     Cross-Examination by Mr. Risley  . . .   73

     MATTHEW NIEZGODA
     Direct Examination by Mr. Mohlhenrich  .   75
     Cross-Examination by Mr. Risley  . . .   81
     Redirect Examination by Mr. Mohlhenrich .   84
     Recross-Examination by Mr. Risley . . .   88

     MYRTLE PYLE
     Direct Examination by Mr. Mohlhenrich  .   89

GOVERNMENT RESTS  . . . . . . . . . . .   92

DEFENSE MOTION  . . . . . . . . . . .   92

DEFENSE'S EVIDENCE

WITNESSES:

     SCOTT B. OLSEN
     Direct Examination by Mr. Risley  . . .   101
     Cross-Examination by Mr. Mohlhenrich . .   109
     Redirect Examination by Mr. Risley  . .   119

I N D E X

Page No.

DEFENSE RESTS . . . . . . . . . . . . 120

DEFENSE MOTION . . . . . . . . . . . . 121

APRIL 23, 2013

INSTRUCTION CONFERENCE . . . . . . . . . 123

INSTRUCTION NOS. 8-16, VERDICT FORMS READ . . . 125

CLOSING ARGUMENTS BY MR. MOHLHENRICH . . . . . 125

CLOSING ARGUMENTS BY MR. RISLEY . . . . . . . 137

REBUTTAL CLOSING ARGUMENTS BY MR. MOHLHENRICH . . 144

REPORTER'S CERTIFICATE . . . . . . . . . 148

INDEX OF EXHIBITS

| GOVERNMENT'S EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| No. 1  Letter 5/09/11 | 25 | 25 |
| No. 2  Letter 5/09/11 | 25 | 25 |
| No. 3  Executive Order | 25 | 25 |
| No. 4  Disaster Declaration | 26 | 26 |
| No. 5  Disaster Amendment | 26 | 26 |
| No. 6  Call Center Scripts | 28 | 28 |
| No. 7  Title 44, 206.111 | 61 | 61 |
| No. 8  Title 44, 206.113 | 61 | 61 |
| No. 9  Help After a Disaster | 30 | 30 |
| No. 10  FEMA Inspection Guidelines | 32 | 32 |
| No. 11  FEMA Olsen file | 33 | 34 |
| No. 14  Photographs | 20 | 20 |

INDEX OF EXHIBITS

| GOVERNMENT'S EXHIBIT | | OFFERED | ADMITTED |
|---|---|---|---|
| No. 16 | 2011 Fair Market Rent | 58 | 58 |
| No. 17 | Personal Property Rates | 58 | 58 |
| No. 18 | General Warranty Deed | 17 | 17 |
| No. 20 | Application | 36 | 36 |
| No. 21 | Contacts Report (pgs 1-2) | 53 | 53 |
| No. 24 | Submission | 39 | 39 |
| No. 25 | FEMA Denial Letter | 43 | 43 |
| No. 26 | Declaration and Release | 44 | 44 |
| No. 27 | Submission | 45 | 45 |
| No. 28 | Submission | 49 | 49 |

* * * * * *

```
 1            USA v. SCOTT BRADLEY OLSEN

 2          CASE NO. 12-5018-01-CR-SW-DW

 3              CRIMINAL JURY TRIAL

 4               APRIL 23, 2013

 5              *  *  *  *  *  *
```

6                THE COURT:  Gentlemen, let the record show that

7    we're having an instruction conference in the courtroom.  Your

8    client isn't here, Mr. Risley.  Do you have any objection to

9    that?

10                MR. RISLEY:  No.

11                THE COURT:  We're just making an instruction record.

12                I'm going to read Instructions 1 through 15 which

13    were jointly submitted by both parties and I'm refusing

14    Instructions A, B, and C which were also, by the way, jointly

15    submitted.

16                Are there any objections to the instructions I'm

17    going to read or refuse by the government?

18                MR. MOHLHENRICH:  No, Your Honor.

19                THE COURT:  Are there any objections to the

20    instructions I'm going to read or refuse by the defense?

21                MR. RISLEY:  No, Your Honor.

22                THE COURT:  All right.  Thank you.

23                Now, let's see, what do you want on closing

24    argument?  Give each side 30 minutes.

25                Mr. Mohlhenrich, I know you know, how much you

1 use -- you get 30 minutes, but how much -- how do you want to

2 split it?

3       MR. MOHLHENRICH:  Twenty and 10, Your Honor, with a

4 five-minute warning on the first close and a two-minute

5 warning on the rebuttal close.

6       THE COURT:  All right.

7       You get 30 minutes.  What type of warning do you

8 want?

9       MR. RISLEY:  Five is fine.

10       THE COURT:  Okay.  Anything else we need to think of

11 before we --

12       MR. MOHLHENRICH:  Nothing from the government, Your

13 Honor.

14       THE COURT:  If you're going to use any exhibits

15 during your closing argument, get them lined up so you're not

16 fumbling around for them.

17       MR. RISLEY:  I think you had my motion for acquittal

18 at the close of all evidence under advisement.

19       THE COURT:  It'll stay there.

20       MR. RISLEY:  Okay.  Very good.

21       THE COURT:  It'll stay under advisement.

22       (Court stands in recess at 8:30 a.m.)

23       THE COURT:  Bring in the jury.

24       (Jury enters the courtroom at 9:06 a.m.)

25       THE COURT:  Good morning, ladies and gentlemen of

124

1  the jury.  We're going to reconvene from an overnight recess.

2  Are we all ready to -- first I'll read -- ready to complete

3  the case by me first reading the instructions and then the

4  attorneys will make their closing arguments to you.

5          (Court reads Instruction Nos. 8-16 and verdict form

6  to the jury.)

7          THE COURT:  Plaintiff may make their closing

8  argument.

9          MR. MOHLHENRICH:  May it please the Court.

10         Good morning.  Thanks again for serving.

11         Now it's almost the part of the case where you

12  finally get to discuss it and deliberate.  The case is about

13  to be placed in your hands.  Oftentimes lawyers like to think

14  a lot about their persuasive abilities and think that they can

15  persuade juries and that's not quite the case.  The evidence

16  is there, you have your common sense, you can interpret it,

17  the judge gives you the law.  All that we can really do is

18  help to summarize and organize it for you and that's what I'm

19  going to try to do here in this closing argument.

20         First off, there are certain elements, as the judge

21  read to you, in the two offenses that are charged here and

22  those elements are something that you should consider when

23  you're trying to decide whether the defendant is guilty of the

24  two counts that he's charged with.  For Count 1 the elements

25  are that the defendant made a materially false or fraudulent

125

statement or representation to the Federal Emergency
Management Agency, FEMA, specifically, that his primary
residence was 2305 Virginia Avenue, Joplin, at the time of the
May 22nd, 2011, Joplin tornado.  Two, that the defendant's
statement or representation was in connection with a benefit,
specifically, the defendant's application to FEMA to receive
disaster assistance funds.  Three, the benefit was in
connection with the presidential disaster declaration for the
state of Missouri effective May 9th, 2011, as amended May
23rd, 2011.  And, four, that the benefit was a payment, money
or thing of value of the United States government.

        For Count 2 the elements that you need to find in
order to find the defendant guilty are, one, the defendant
knowingly and intentionally made a materially false statement
or representation to the Federal Emergency Management Agency,
FEMA, specifically in connection with this application for
disaster assistance.  The defendant claimed his primary
residence was 2305 Virginia Avenue, Joplin, Missouri, at the
time of the May 22nd, 2011, Joplin tornado.  Two, the
statement or representation was made about a matter within the
jurisdiction of the Federal Emergency Management Agency, FEMA,
an agency of the executive branch of the United States
government.  And, three, the defendant knew it was untrue when
he made the statement or representation.

        I think that when you're considering the evidence

126

probably the only one of those elements as to either of the
counts that is going to be in doubt and that both the defense
and the prosecution are going to be arguing about is the
statement or representation the defendant made.  It was
clearly in connection with a benefit, specifically the
disaster application, the benefit was in connection with
presidential disaster declaration for the state of Missouri.
You saw the evidence that the president actually did declare a
disaster and that that disaster was expanded to include Jasper
and Newton Counties.  And, fourth, that the benefit was a
payment, money or thing of value of the United States
government.  If the defendant had been approved for aid, he
would have gotten FEMA money.  That's from the United States
government.

        For Count 2, the second element isn't in doubt, that
it was a matter within the jurisdiction of FEMA.  FEMA was the
one conducting the inspection and determining his eligibility.
And, three, the question will be whether the defendant knew
that his representations were untrue at the time that they
were made and the representations themselves are what we're
going to get to.

        So let me summarize the evidence that you've heard
yesterday.  Back on May 9th there was a disaster declaration
for the state of Missouri for flooding and storms and
tornadoes up north.  That was Disaster No. 1980.  You saw that

127

in Exhibits 1, 2, and 4. On May 22nd, 2011, the Joplin
tornado took place. And on May 23rd, the director of FEMA,
pursuant to delegation of authority, extended the disaster
declaration to include Jasper and Newton Counties. Those were
Exhibits 3 and 5.

On May 26th of 2011, Mr. Olsen submitted a
application online listing 2305 Virginia Avenue as his
secondary residence. He didn't list in as a primary residence
in that application.

Now, on May 10th -- and that was Exhibit 20, by the
way. On May 10th Mr. Olsen came into the DRC, the Disaster
Recovery Center, and stated that he was in the process of
moving into a house, that he lost video production equipment,
furniture and personal property. The person sharing the house
with him had not been seen since the storm and all utilities
were in the other person's name and he furnished a letter.
That was June 10th. Now, he furnished a letter to FEMA about
that. And his statements themselves you can see in
Exhibit 21. They were the FEMA clerk's writing down what his
comments were. Then the letter that he furnished was
Exhibit 24. I'm going to put this up on the ELMO and read it
to you again because this is important.

The letter says, "I, Scott Olsen, and Jasen Howard
were co-renting the white, single-family home at the above
address." The above address being 2305 South Virginia Avenue,

128

Joplin, Missouri, 64804. "I was paying the deposit, cash,
Jasen was to put the electric and gas in his name and we would
split the rent $375. Jasen was last seen by the clerk at
Snack Attack on 20th and Main walking south just prior to the
tornado. Under penalty of perjury I declare the above
statement true." That was submitted by Scott Olsen on
June 10th to FEMA.

Now, as a result of that, as Cathy (sic.) Malone
testified, an inspection was ordered and the defendant spoke
with an inspector, Mr. Mark Parr. Mr. Parr recorded in his
notes that Mr. Olsen stated that 2305 Virginia Avenue was not
his primary residence, that his primary residence was actually
his mailing address and that is in Exhibit 21. Let me put
that note up on the screen because, again, that's important in
considering the timing of all of this.

I'm sorry. I don't have it in front of me. You'll
need to refer to that exhibit when you get back to the jury
room.

As Mr. Parr testified, he made that notation in the
exhibit and in his computer pad because he wanted to clarify
what it was that the defendant was telling him at the time.
"App stated that primary residence equals mailing address."
So, in other words, he was saying that he's still saying that
that wasn't his primary residence.

Now, on the basis of that he was denied and

1  Exhibit 25 was the denial letter from FEMA.  He was not

2  approved for money.  So the story that Mr. Olsen was giving

3  wasn't quite good enough to get him cash.

4         So what did he do next?  He comes back in again and

5  he furnishes more information.  And this representation that

6  the defendant made was that he was actually leasing the

7  property.  He had entered into a lease.  And let me show you

8  Exhibit No. 26 which is actually the exhibit that he -- well,

9  first of all, the statement that he signed, Exhibit 26, is his

10 declaration and release.  By his signature there what he

11 confirms is that all information he provided to FEMA is true

12 and correct.  And this is important.  He's stating that under

13 penalty of perjury.

14        What information was he providing at the time to

15 FEMA?  Exhibit 27 is the letter that he provided at that time.

16 I'm going to put that up on the screen again.  And it says,

17 "I, Scott Olsen, this statement accompanies my rental

18 agreement for the home at 2305 Virginia in Joplin, Missouri.

19 I entered into a lease on 5/20/11 moving my personal property

20 in on of the 21st of May."  I repeat, "Moving my personal

21 property in on the 21st of May.  The property manager, Dean

22 Richey, signed the document and gave me the keys.  The address

23 and contact info for him and the owner were in the house when

24 the tornado struck.  All I have is the rental

25 agreement/receipt."  And again I say, "The address and contact

information for him and the owner were in the house when the tornado struck. All I have is the rental agreement/receipt. The house at 2305 Virginia has also never been inspected by FEMA. There is/was no rental insurance on my personal property. Attached is a list of personal property lost. I can be contacted at," and, "I declare under penalty of perjury that the foregoing is true and correct."

He provided the list of personal property. I'm not going to read that to you again. Then he provided this lease. And the lease has a signature on it, his signature which appears the same as his signature on the other documents, and a signature purportedly by a Dean Richey. I'll be asking you to examine that carefully when you get back into the jury room to deliberate.

Now, what happened next? And that was submitted on July 12th and then on July 13th Mr. Olsen came in to check on his case status. On July 17th he called to check on the case status and made the additional statement that the utilities were to be changed over on May 23rd of 2011.

On July 20th, then, Mr. Olsen furnished a letter from Dean Richey and a cover email claiming that Mr. Richey saw Olsen moving in on May 21st. He signed another declaration and release once again affirming that the information that he provided was true and correct. And I'm going to put this letter up on the screen because it is very

131

important.  And, once again, the letter says that, "My name is
Dean Richey.  For the past several years I have worked for
numerous homeowners, property management companies and
apartment complexes around the Joplin, Galena and Baxter
Springs areas.  I do maintenance, repairs, security, rent
collection, and leasing.  I have recently relocated to the
Baxter Springs area of Kansas.  One of the properties I
maintain was located at 2305 South Virginia Avenue in Joplin,
Missouri.  On the 20th of May last I signed the lease
agreement with a Mr. Scott B. Olsen for the amount of $375 per
month with a negotiated deposit amount of $300.  This is a
reduced amount based on the cleaning and paintings of two
rooms that Mr. Olsen agreed to undertake.  The monies were
received by me and the 20th," should have been on the 20th, I
think, "and the keys were given to Mr. Olsen.  The lease was
to be for one year and occupancy prior to the 1st of June was
authorized as long as the utilities were transferred into
Mr. Olsen's name no later than May 31st.  I returned to the
property on May the 21st, Saturday, to check on the progress
of the painting and witnessed Mr. Olsen moving his personal
property into the residence.  The residence was subsequently
destroyed on Sunday the 22nd of May, 2011, by the F5 tornado
that struck Joplin."

         Next paragraph is also important.  "I hope this
clarifies Mr. Olsen's resident status and the monetary

132

1    arrangement surrounding the rental." Resident status, a

2    curious term for Mr. Richey to use. There was also a cover

3    email purportedly from Mr. Richey to Mr. Olsen and then

4    another declaration and release that Mr. Olsen signed

5    certifying that all the information that he provided to FEMA

6    was true and correct.

7            Now, recall that on the witness stand Mr. Olsen

8    actually said that at the time -- and this is just going by

9    his story -- that Mr. Richey actually provided him with that

10   letter and that he didn't forge it as, of course, he did. But

11   just going by his story that Mr. Richey provided him with

12   that, that statement that he was moving in on the 21st of May,

13   that he was observed, that he had the keys, that he was moving

14   his personal property into the residence, that was false by

15   his own admission. He knew it and he gave it to FEMA. That

16   right there is a false representation that he was moving into

17   the property. And you need to tie that back, of course, to

18   the definition of a primary residence and remember that Connie

19   Malone was talking about that and what a primary residence is.

20   I'll get to that in just a minute, but one thing that she said

21   was that a primary residence is the place where you've lived

22   for most of the year. Normally FEMA considered that to be

23   greater than six months; however, I asked her on redirect,

24   Well, is there a situation where somebody can live in a place

25   for less than a year and it be their primary residence? What

                              133

did she say?  She said yes, if they had just moved in.  So

that's what the defendant, Mr. Olsen, was, in fact,

representing to FEMA.

The defense will —— as I'm sure he will because it's

the only really —— the only argument that he can make, will

say that, Well, he never said the words *primary residence*.

But what he was doing by submitting that document to FEMA was

he was representing to FEMA that that was his primary

residence, that he had moved in.  And why was he doing that?

Because he wanted money.

Now, FEMA then conducted an investigation,

discovered that Mr. Olsen had not lived in the property.  They

called Mrs. Pyle and found out that they had actually owned

the house since 1977.  In the system it was linked up ——

Ms. Malone talked about linked cases and how they saw the

claim that was filed by Harry McLaughlin because he was a

resident of the property, they saw that the Pyles were the

owners of the property and all of that information was linked

up, so ultimately Mr. Olsen's application was denied.

THE COURT:  You have five minutes.

MR. MOHLHENRICH:  Thank you, sir.

In other words, the system worked.  The checks

worked.  However, that doesn't change the fact that the

defendant made those representations.

So let's look at why these representations were

134

1   false.  He originally filed the application as his secondary

2   residence and stored property.  Then he found out that he

3   wouldn't get money for that, that wasn't good enough for FEMA,

4   so the sorry changes a little bit.  He provides a first letter

5   saying that he was co-renting and had moved in, Exhibit 24.

6   That letter gets an inspection assigned.  But he's still

7   denied because the inspector, after talking to him, still

8   determines that that was a secondary residence.  So what does

9   he do to try to get money?  He then furnishes a lease, a lease

10  that I believe that the evidence shows was forged.  You should

11  compare the signature of Dean Richey that's on that lease to

12  some of the defendant's handwriting in the other letters that

13  he submitted.  I think you'll see that he signed Dean Richey's

14  name.

15          By the time he was interviewed a year later, the

16  story had changed a bit to the fact that he had never been

17  inside the residence at all, that all his property was inside

18  a van, a white van, a white Ford Econoline van that was never

19  seen by anyone else on the street there.  It disappeared.

20          Now, look at the ridiculousness of the story that

21  the defendant gave.  He agreed to rent the place sight unseen

22  from Dean Richey.  He paid $675 cash to this individual.  He

23  put all his property that he supposedly lost -- and remember

24  the story changed a little bit when Mr. Olsen was on the

25  witness stand as well.  It wasn't all of his property, it was

                                 135

1  some of his property because, of course, all the property on

2  that list would not fit in a white Ford Econoline van.

3        And why the need for such an elaborate, ridiculous

4  story?  It's because he was caught in his original lie which

5  was when he tried to convince FEMA that he had moved into 2305

6  Virginia Avenue the day before the tornado destroyed the

7  house.

8        Now, the defense argument is that he never used the

9  words *primary residence* and that, thus, he didn't make the

10 specific false statement charged in the indictment; however,

11 from Exhibit 7 -- you'll want to look at this when you get

12 back in the jury room -- "primary residence means the dwelling

13 where the applicant normally lives during the major portion of

14 the calendar year or the dwelling that is required because of

15 proximity to employment, including agricultural services that

16 provide 50 percent of the household income."

17       My question to Ms. Malone:  When could a primary

18 residence be a place where a person has lived less than six

19 months of the year?  Her answer:  When the applicant had just

20 moved in.  He was trying to convince FEMA that he had just

21 moved in.  That was his false and fraudulent representation to

22 FEMA.  Why was he trying to convince FEMA he had just moved

23 in?  Because if he lived there, if it was his primary

24 residence even for one day, he would get money.  There's no

25 question it was false.  It wasn't even a good lie.

                                136

1      Find the defendant guilty because he is guilty.

2      THE COURT:  Thank you.

3      Defense may make their closing argument.

4      MR. RISLEY:  Ladies and gentlemen, thank you for

5 your time and service on this case.  We're about to be in a

6 position where you'll go back to talk about the case.

7      When I was younger, my parents at one point played

8 me a little thing that I heard on the radio -- or that they

9 heard on the radio, and I'm not going to sit here and try to

10 repeat it but, frankly, it was from Abbott and Costello.  The

11 gist of it was who's on first, what's on second, I don't know

12 is on third.  Again, I'm not going to try to repeat that.  And

13 certainly that was made as a joke or a comedy thing for

14 baseball, this case certainly is not a joke.  But I bring that

15 up because I sat here and represented Mr. Olsen on this case,

16 sat here listened to the testimony that was provided by the

17 government yesterday, it just keeps coming back to me in the

18 sense of a tornado occurred.  Again, obviously, not a funny

19 event.  We heard what the Pyles went through.  That was

20 unfortunate.  What Mr. Olsen went through, same thing.

21      But Mr. Olsen goes to apply for aid.  Is this your

22 primary residence?  He fills out an application.  The answer

23 is no.  So they send him a letter and it says, "We're sorry we

24 can't help you but you can appeal this and so provide us some

25 information about what happened."  So he provided information

137

1    what happened.  Government doesn't believe it, that's fine,
2    but let's go through what the actual evidence was.

3          He provided them information, they looked at the
4    information, they said, Well, that doesn't match up.  Let's
5    send an inspector out, which they did on June 21st, to say,
6    "Now, Mr. Olsen, tell us what happened.  Is this your primary
7    residence?"  "No, it's not my primary residence.  Remember on
8    my application, my mailing address is my primary residence.
9    It wasn't damaged."  "Okay.  Well, we're sorry.  We can't help
10   you.  Here's another letter.  But you can appeal."

11         And if you look through Exhibit 9, there's 20-some
12   pages of, you know, how this goes through.  I understand that
13   FEMA and the employees that deal with this, they deal with it
14   all the time.  They're very familiar with those applications.
15   People that are involved in a disaster of this sort, they're
16   not.  They get all this information and they're told to fill
17   out forms and they provide information that is put on an
18   application like Exhibit 20.  They call in, they call several
19   different people.  You heard Connie Malone say that we have
20   several applicants and they make notes and they make comments
21   and they go through this whole thing.  Again, it's -- he's
22   providing information.  "No, that's not what we need.  That's
23   not right.  You don't get benefits based off of that, but you
24   can appeal.  And tell us again, where's your primary
25   residence?"  "It's this other house."

That's what he's charged with.  You've gone through, you'll see the instructions.  I'll show you a little bit again what the Court has already read to you.  He's charged with making a false statement that 2305 Virginia was his primary residence.  Every witness -- and I'm setting the Pyles aside. They again, their house was damaged.  It's unfortunate they even had to come up here and testify to this but their house was damaged.  We don't dispute that.  The red house was damaged.  And I'll get to that in a minute.

But every witness that the government called, Niezgoda, Mr. Parr, Connie Malone all said, yes, the defendant, he filled out an application.  He didn't put that as his primary residence.  He talked to Mr. Parr three or four weeks later, he told him that wasn't his primary residence. He told him where his primary residence was and it wasn't damaged, yet we're still here because of some letters that they said -- that they interpreted to say he was trying to claim this as his primary residence when, again, he's got the lease, he told you what happened with regard to himself, Mr. Richey and Jasen Howard.  They want to tell you that's all made up.  He just made that whole thing up.  We don't have Dean Richey.  Frankly, I can't tell you where Dean Richey is. Mr. Olsen can't tell you where Dean Richey is.  Dean Richey's got $675 and he's off, you know, away from this.  People get scammed all the time.  It happens.

139

Niezgoda checked on the information that Mr. Olsen
gave him about Jasen Howard.  He confirmed that a Jasen Howard
exists.  It's not like he made that name up.  That was a
person he lived with several years back and it's certainly
conceivable and plausible that it happened just as Mr. Olsen
told you.  He got there, his property was gone.  He, frankly,
was going to FEMA to try to see if he could recover property.
He filled out the application as they said.  I want to show
that to you again.  I know it's been seen again but this is
the application he filled out.  Paragraph 8, that's his
residence.  Paragraph 12, "Is this the address of your primary
residence?"  "No."  This application was never changed.

         You heard Connie Malone say, Well, we go through
notes and comments and decide that based on what we get but
they sent Mark Parr out.  He came here and testified that he
was the inspector to check on this.  The only testimony he
provided was that, I talked to Mr. Olsen, he told me that was
not his primary residence and that his primary residence was
the Wall Street address where he lived.

         I again go to the definition that FEMA uses.  He
testified to this.  Mr. Mohlhenrich just read it to you.  I'm
not going to read it again.  But the definition of this 2305
Virginia for Mr. Olsen, it wouldn't fit into that definition
or that terms.  He's talking about, Well, Connie Malone said
that it might and this and that but this is the definition.

                              140

1  Under the definition portion of this under primary residence,
2  that wouldn't even fit.  That's what Mr. Olsen told them.

3       The comments on Exhibit 21 when he called in, the
4  people on the -- actually, it was on Exhibit 22.  That didn't
5  come in.  But you'll remember Connie Malone testified that he
6  called in on June 21st, the same time he had talked to
7  Mr. Parr and was talking with Carol Tanner and he again told
8  her about this apartment.  2305 Virginia is not an apartment.
9  His Wall Street address is an apartment.

10      You've got the instruction and the Court read you
11 one that talks about how witnesses sometimes see or perceive
12 or hear different things.  We're dealing in a situation in a
13 disaster area where the FEMA employees are trying to help as
14 many people as they can.  The people that come in to receive
15 assistance are not in the best state of mind.  And, again, as
16 Instruction 10 tells you, you have to keep in mind that people
17 sometimes hear and see things differently and sometimes forget
18 things.

19      Also there's a red house.  His letter of June 10th
20 says it was a white house on the corner.  Certainly
21 conceivable that Dean Richey showed him a house that wasn't
22 the correct address that said move in here, which is why the
23 Pyles didn't see him or the van.

24      You'll also remember -- this was the first
25 instruction -- that this defendant is the only one on trial

here.  So we're not on trial for Mr. Richey.  He's not
responsible for his crimes.  This defendant is only on trial
for the crimes charged and not anything else.  That was the
first instruction you got.  Again, they think he made up this
list.  They think he did all kinds of things.  I understand
that.  But they charged him with saying this house was his
primary residence when it wasn't.  He doesn't dispute it
wasn't.  In fact, he told them on at least two occasions.  The
only three times the words *primary residence* have come up are
on May 26th when it was on the application and he said no, on
June 21st when he talked to Mark Parr and he told him no,
that's not his primary residence, and then when they charged
him.

Look through Exhibit 9.  Exhibit 7, sure, it's a
FEMA statute.  I don't think Mr. Olsen was going to look at
it.  The FEMA employees would know about it but their
Exhibit 9, all of their application stuff, it doesn't define
primary residence.  It doesn't go through all this.  They're
here -- or the government is here on the case because they
didn't like his letters, they thought he was making something
up, but what they charged him with is something that he didn't
make a statement about.  He said it's not his primary
residence.  They don't have evidence of that.

The instructions again talk about that and
Mr. Mohlhenrich covered this, talk about saying he knowingly

142

1  and willfully represented that his primary residence was 2305

2  Virginia and that the presumption of innocence alone is

3  sufficient and to find the defendant guilty can only be

4  overcome if the government proves beyond a reasonable doubt

5  each element.  The first element of each of these is key to

6  this.  You have to be firmly convinced of the defendant's

7  guilt.  Again, you're going to see these but that's Count 1,

8  the material false or fraudulent statement that his primary

9  residence was 2305 Virginia.  I probably talked that to death.

10 I'm not going to keep going over it.  Again, it's on 15.  And,

11 real quick, 16 says that it must be based solely on the

12 evidence and on the law which I have given you in the

13 instructions.

14      The verdict forms which you'll see -- again, I

15 understand these are the ones I'm going to ask you to come

16 back and sign, you'll see them, but we'd like you to write in

17 the words not guilty on Verdict Form A and on Verdict Form B

18 because we think that's what the evidence shows.

19      Mr. Mohlhenrich talks about the handwriting.  We

20 don't have a handwriting expert here.  I don't believe

21 Mr. Mohlhenrich's qualified as a handwriting expert.  You can

22 look at it.  I've looked at it.  There's a bunch of letters in

23 Dean Richey's name on that signature.  There's a bunch of

24 letters on the letters that Mr. Olsen wrote.  Again, you can

25 make your own comparison to that.  I don't see it.  Mr. Olsen

143

1  has told you where he got that letters and information.  It's

2  certainly plausible and reasonable that somebody in

3  Mr. Richey's position that scammed him might send an email to

4  be rid of this but then be gone and we can't find him.  Might

5  not have even been his name.  Don't know.  We know Jasen

6  Howard's name is correct because Mr. Niezgoda confirmed that

7  for us.

8          You'll also remember Connie Malone and Inspector

9  Niezgoda were asked if they had any idea whether or not

10  Mr. Olsen lost property in this case and they said no.  They

11  don't think he did.  But not thinking he did and charging him

12  with making a fraudulent statement when he didn't even make

13  that fraudulent statement, that's a big leap, in my opinion.

14  That's why we're asking you to find the defendant not guilty.

15          Thank you.

16          THE COURT:  Thank you, Mr. Risley.

17          Mr. Mohlhenrich.

18          MR. MOHLHENRICH:  Yes, Your Honor, just briefly.

19          The elements in both of the counts that he's charged

20  with say statement or representation.  The defense is focused

21  and I think it's -- the only argument that can even be made --

22  it's not a very good argument, but the only argument that can

23  be made is that he never uttered the words *primary residence*.

24  The government does not dispute that there's nothing in the

25  evidence anywhere that the actual words *primary residence*

144

passed this defendant's lips.  However, what was he trying to establish?  He was trying to establish that the house was his primary residence.  He was representing that to FEMA.  That is why he submitted the forged lease, the letters from Mr. Richey, all of that information.  These were representations that were being made to FEMA.  And why?  Because he wanted to receive money.

Now, the defense quoted the instruction about how people -- there may be innocent misrecollections that people see and hear and don't remember things quite the same way. You need to focus on whether it's an important fact or a fact that's not very important.  Now, is it an important fact whether the defendant actually moved into the property because he wrote that in one of his letters.  He said up on the witness stand under cross-examination, Oh, that was just a misstatement, he should have stated it a little bit differently.  I'd say so.  If he hadn't moved in, he wouldn't be eligible to receive money and if he had moved in, as Connie Malone testified, he would have gotten more than $4,000 for the loss of his personal property.  That's a significant amount of money.

Now, the defendant even admitted under cross-examination that he did make a false representation to FEMA.  That was the letter that he provided from Dean Richey -- supposedly from Dean Richey.  Another thing to look

145

1 at is the verbose, florid language that's used in that letter
2 and compare that to, you know, how the defendant presented
3 himself on the witness stand. That letter, you know, sounds
4 like the defendant wrote it. But that letter, you know, he
5 said that that statement about him actually moving into the
6 property, that he'd gotten the keys, that Mr. Richey had
7 returned on May 21st and saw him moving in, the defendant
8 admitted that was a false statement and he submitted that to
9 FEMA at the same time that he signed the declaration and
10 release saying that all of the information that he provided to
11 FEMA was true and correct. Now, that was clearly about a
12 material matter because if FEMA had believed -- as Connie
13 Malone testified, if FEMA had believed that he had moved in
14 and that that was his residence even for a day, he would have
15 gotten money.

16        Natural disasters bring out both the best and the
17 worst in human nature. The Joplin tornado is no exception to
18 that. The Pyles went through a horrific ordeal. There were
19 people who did incredible acts of heroism and self-sacrifice.
20 There are also some people whose nature is not as good and
21 that comes out in their reactions to a natural disaster.

22        The defendant in this case filed a claim for an
23 address that he did not live in, 2305 Virginia Avenue. He
24 tried to get money that was intended to help real victims of
25 the tornado. He wasted FEMA time and resources that should

146

have been devoted to helping real victims.  All of this to try
to falsely persuade FEMA that he had moved into 2305 Virginia
Avenue the day before the tornado.  The defendant thought that
he could actually get away with it.  The defendant needs to be
held responsible for his actions.  Find him guilty of disaster
fraud because he is guilty.  Find him guilty of making false
statements or representations to FEMA because he is guilty of
that.

      Thank you.

      THE COURT:  Thank you, Mr. Mohlhenrich.

      Ladies and gentlemen of the jury, it's time for you
to retire and begin your deliberations.  First we'll give you
the copies.

      Everyone please rise while the jury retires.

      (Jury exits courtroom.)

                 END OF VOLUME 2

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*s:/Jeannine M. Rankin*

Date:                    Jeannine M. Rankin, CCR, CSR, RPR

Case 3:12-cr-05018-DW   Document 74   Filed 10/08/13   Page 30 of 30